# Exhibit 1

## PURCHASE AND SALE AGREEMENT



### hp indigo press s2000 Six-Color
Seller: Indigo America, Inc., a wholly owned subsidiary of Hewlett-Packard Company (hereinafter referred to as "Seller")

| Buyer: | Sandia Imaging | Today's Date: 12/5/02 | Expiration Date: 1/31/03 |
|---|---|---|---|
| Attn: | Bertrand Pelletier | | |
| Street: | 2811 Galleria Drive | Requested Shipping Date (No Later Than): December 16, 2002 | |
| City/State/Zip: | Arlington, TX 76011 | | |
| (hereinafter referred to as "Buyer") | | Account Executive: R. Oomen | District Mgr: B. Shepherd | Branch Mgr: M. Daly |
| SHIP TO ADDRESS (IF DIFFERENT FROM ABOVE): | | | |
| Attn: | | Buyer's Phone No.: 817-649-3222 | |
| Street: | | Buyer's Fax No.: 817-649-3301 | |
| City/State/Zip: | | | |

F. O. B. Point: Shipping Point

| EQUIPMENT DESCRIPTION | PRICE |
|---|---|
| Newly Manufactured hp indigo press s2000 Six-Color including:<br>• One-Shot Color™<br>• Pentium™ CPU with Windows NT<br>• 72 GB Virtual Image Memory (RAID)<br>• Internal hp indigo RIP (Adobe® PostScript 3)<br>• Electronic Collation<br>• Color Personalization<br>• Image Tracking Technology (ITT)<br>• 5th & 6th Color<br>• hp IndiChrome ink mixing system (excl PC)<br>• 2.2 GB ORB Archive Device<br>• In-Line Densitometer<br>• HDI | $329,000.00 |

| INDICATE "YES" OR "NO" FOR EACH ITEM BELOW | EQUIPMENT SYSTEM TOTAL | |
|---|---|---|
| | Newly Manufactured hp indigo press s2000 Six-Color as above | $329,000.00 |
| | Freight includes shipping direct to Buyer's facility. DOES NOT INCLUDE RIGGING | $5,000.00 |
| NO | hp production flow without Adobe RIP | $20,000.00 |
| NO | hp production flow with Adobe RIP | $35,000.00 |
| | **TOTAL (in USD)** | **$334,000.00** |

PAYMENT TERMS: 10% with order; 80% prior to shipment; 10% upon certification by Seller of Completion of Installation

BY SIGNING BELOW, BUYER ACKNOWLEDGES THAT THIS AGREEMENT CANCELS, SUPERSEDES AND REPLACES ANY AND ALL PRIOR AGREEMENTS OR UNDERSTANDINGS, WRITTEN OR ORAL, WITH RESPECT TO THE PURCHASE AND/OR LICENSE OF THE EQUIPMENT (SEE PARAGRAPH 18 OF THE TERMS & CONDITIONS).

BUYER*** *[signature]*
BY: _____
PRINT NAME: BERTRAND L. PELLETIER
TITLE: PRESIDENT & CEO
DATE: 12/5/02

INDIGO AMERICA, INC., a wholly owned subsidiary of Hewlett-Packard Company *[signature]*
BY: _____
PRINT NAME: Rick Mangold
TITLE: General Manager
DATE: 4-30-03

***THIS PURCHASE AND SALE AGREEMENT IS SUBJECT TO ACCEPTANCE BY A DULY AUTHORIZED REPRESENTATIVE OF INDIGO AMERICA, INC, AND SHALL NOT BE CONSIDERED A CONTRACT UNTIL WRITTEN ACKNOWLEDGEMENT IS FURNISHED TO BUYER BY SELLER.

PURCHASE AND SALE AGREEMENT                                                                                     Page 2

### WARRANTY
Seller agrees to provide Buyer with a three (3) month warranty (the "Warranty Period") on the Equipment. In addition, Seller will provide Buyer with an additional three (3) months of warranty, thereby extending the Warranty Period to a total of six (6) months if Buyer (i) contemporaneously with the execution of this Purchase and Sale Agreement, executes a one (1) year agreement for Seller's Shared Maintenance on the Equipment and (ii) completes the required Shared Maintenance Training Course within six (6) months of Seller's completion of installation of the Equipment,. In either event, the Warranty Period shall be deemed to have commenced upon Seller's certification of completion of installation of the Equipment.

### BASIC OPERATOR TRAINING
For the Equipment described on the face-page of this Agreement, Seller provides, at no cost to Buyer, up to fourteen (14) days (the "Training Period") of press and pre-press training ("Basic Operator Training") at one of Seller's designated Training Centers for two (2) of Buyer's qualified operators.

Buyer shall be responsible for all travel arrangements, food, lodging, compensation and other related expenses for Buyer's employees during the Training Period.

Buyer shall have six (6) months from the date of Seller's certification of completion of installation of the Equipment, to complete the training described above. In the event Buyer fails to complete the Basic Operator Training within such time period, Buyer shall be deemed to have waived its rights to receive, at no cost, the Basic Operator Training described herein.

All training services provided by Seller, in addition to the Basic Operator Training, such as retraining or training of an additional operator, shall be billed to Buyer at the then current applicable rate.

### LEASE FINANCING        ☒YES ☐NO
IF YES, BUYER'S INITIALS REQUIRED: _____hw_____

Buyer intends to seek third party financing for the purchase of the Seller Equipment described this Agreement. At Buyer's request, Seller will assist Buyer in obtaining third party lease financing. If Buyer is unable to qualify for financing, upon terms and conditions acceptable to Buyer in Buyer's sole discretion, Buyer shall have the right to rescind this Agreement upon written notification to Seller, provided, however, that such notification must be provided to, and received by, Seller prior to shipment of the Equipment by Seller to Buyer. In the event of such rescission, Seller will refund Buyer's deposit in its entirety.

### STATE SALES/USE TAX
Is Buyer exempt from State Sales/Use Tax?    ☒YES ☐NO
IF YES, PLEASE ATTACH A COPY OF EXEMPTION CERTIFICATE.

### ACCOUNTS RECEIVABLE CREDIT
Upon Seller's Certification of Installation of the Equipment described herein, and receipt of all payments due hereunder from Buyer, Seller will provide Buyer with a credit in the amount of Nineteen Thousand Two Hundred Eighty and 00/100 dollars ($19,280.00 USD) to be applied to Buyer's Imaging Product Account Receivable Balance with Seller.

### FINAL AGREEMENT
Buyer specifically acknowledges and agrees that the provisions of this Purchase and Sale Agreement represent the entire agreement between Buyer and Seller with respect to the purchase of the Equipment, and that this Agreement supersedes and cancels any and all prior understandings, written or oral between the parties, including, but not limited to, that certain Purchase and Sale Agreement dated December 2, 2002.


Buyer's Initials: __hw__    Date: __12/5/02__
Indigo America, Inc. __RM__    Date: __4/30/03__

*Revised October 2002 by tje*

| PURCHASE AND SALE AGREEMENT | TERMS AND CONDITIONS OF SALE | Page 3 |

1. **EQUIPMENT DEFINITION.** The term "Equipment," wherever used in this Agreement shall mean all of the equipment and/or software described on page 1 and purchased or licensed by Buyer under this Purchase and Sale Agreement. Equipment described as "**Newly Manufactured**" has been factory produced to product operating specifications, and contains not less than ninety percent (90%) brand new parts, with the remaining parts comprised of remanufactured, reprocessed or reconditioned parts that have been disassembled and reassembled in accordance with Seller's highest standards. Equipment described as "**Previously Operated**" has been previously operated and, unless a Warranty Period is stated on Page 2 of this Agreement, is provided to Buyer "**AS IS/WHERE IS**".

2. **ACCEPTANCE.** Acceptance of the Buyer's Purchase and Sale Agreement, hereinafter referred to as the "Agreement," is expressly limited to the terms and conditions set forth herein and in the attachments, if any, hereto, which, upon the express written acceptance by Seller, shall constitute the complete agreement between the parties. This Agreement is a *firm* Agreement and shall not be withdrawn by the Buyer for want or lack of consideration, nor shall the Buyer attempt to amend this Agreement without the express written approval of Seller. Any additional or different provisions to this Agreement shall be deemed material and are hereby objected to and rejected.

3. **PRICES.** If there is a delay in completion of shipment of the Equipment purchased under this Agreement, due to any change requested by Buyer or any delay on Buyer's part in furnishing information required for completion of this Agreement, the price agreed upon at the time of acceptance of this Agreement by Seller is subject to change. Prices are FOB shipping point and are exclusive of all taxes - federal, state, or local - which shall be paid by Buyer, either directly or through Seller. If such taxes are not included in an invoice for the Equipment, they may be invoiced separately later.

4. **TERMS OF PAYMENT.** Unless otherwise stated on the face page hereof, all payments shall be made by bank wire funds transfer to Seller's bank account as directed by Seller in writing, or other reasonable payment method acceptable to Seller, in accordance with the payment terms set forth on the face page hereof, without abatement, set-off or deduction of any amount whatsoever and despite any defense or counterclaim Buyer may have against Seller. A finance charge of 1.5% per month will be added to, and will be payable by Buyer in respect of, all invoices not paid in accordance with the aforesaid payment terms.

5. **TITLE; RISK OF LOSS; INSURANCE.**
   (a) Buyer shall take title to, and shall accept the Equipment, upon delivery to Buyer's site. Buyer grants Seller a Purchase Money Security interest in any product that has not yet been fully paid for, and further agrees to execute any documents required by Seller to perfect this security interest.
   (b) Delivery shall occur, and risk of loss shall pass to Buyer, upon delivery of the Equipment to Buyer's site.
   (c) Seller shall arrange for the shipment of the Equipment to Buyer and shall charge Buyer for such shipment as set forth on the face page hereof.
   (d) As of the date of arrival of the Equipment at Buyer's premises, and until such time as full payment for such Equipment has been effected by Buyer, Buyer shall obtain and maintain insurance with respect to the Equipment, naming Seller as loss payee, to such extent and against such risks, hazards, and liabilities as is currently maintained by companies similarly situated (provided, however, that in no event shall the amount of insurance required to be maintained against damage to or loss of the Equipment be less than any balance owed to Seller with respect to the Equipment).

6. **TIMETABLE AND FORCE MAJEURE.**
   (a) Any delivery time and/or installation date appearing on the face hereof, or in any other document furnished by Seller, will be deemed an approximation only. The approximate delivery time/s will begin to run on the date of Seller's acknowledgment of Buyer's purchase hereunder and receipt of all specifications; except that, in the case of special items considered non-standard by Seller, such delivery time/s will begin to run on the date on which Seller receives complete information necessary to design and manufacture the relevant Equipment.
   (b) All estimated shipping and installation dates are subject to delays caused by Buyer as well as civil insurrection, war, fire, strike, labor stoppage, act of God, shortage of fuel, energy or materials, the failure of suppliers or subcontractors to satisfactorily meet scheduled deliveries, the establishment of any priority systems by the United States government or any of its agencies, or any other factor or cause beyond Seller's or Seller's affiliated company's reasonable control. None of the above-described factors or causes shall give rise to any liability on Seller's part whatsoever, including without limitation loss of use or profits as well as any indirect, incidental, or consequential damages. If any of the aforementioned contingencies occurs, Seller may allocate production, delivery, and installation among its customers and may adjust delivery and installation schedules as it deems necessary in its reasonable discretion.

7. **INSTALLATION AND OPERATIONAL CHECKS.**
Seller's technical personnel shall install the Equipment at Buyer's site. In connection with the installation, Buyer shall ensure that its site for the installation of the Equipment and Software is in full compliance with Seller's then current site preparation specifications, a copy of which shall be furnished by Seller prior to the Anticipated Delivery Date.
   (a) Prior to installation, Buyer shall not handle, attempt to operate, or operate any Equipment except in the presence and under the supervision of authorized Seller technical personnel, and shall prevent any third party from doing so. Following installation, Buyer will cause the Equipment to be operated only by competent and properly trained operators in accordance with the standard operator's manual furnished by Seller.
   (b) Upon installation of the Equipment, Seller's technical personnel shall conduct, in accordance with Seller's then current operational check procedures, a series of operational checks thereon. Seller's personnel will confirm successful completion of the operational checks by signing and furnishing to Buyer, upon Buyer's request, a Certificate of Completion of Installation in respect of the Equipment.
   (c) Post Installation: After installation of the Equipment in accordance with Seller's direction, Buyer will not modify any Software or hardware configuration and/or connection(s) of the Equipment, without prior notification to and express written permission from Seller. Any modification of the installed configuration and/or connection(s), without Seller's express written consent, will void all applicable Software license agreements.

8. **WARRANTIES; LIMITATION OF LIABILITY.**
   (a) Seller warrants, for the Warranty Period described in this Agreement, each item of Equipment against defects arising from Seller's faulty materials and workmanship, provided that (1) Seller

Buyer's Initials: _____   Date: 12/5/02

Indigo America, Inc. _____   Date: 4/30/03

*Revised October 2002 by tje*

PURCHASE AND SALE AGREEMENT     TERMS AND CONDITIONS OF SALE     Page 4

has received, prior to the end of Warranty Period specified herein, written notice regarding a defective part of an item of Equipment, (2) Buyer has afforded Seller prompt and reasonable opportunity to inspect any part as to which any claim is being made, and (3) the relevant part has been stored, shipped, handled, installed, operated, and maintained in accordance with the then current recommendations set forth in Seller's manual and/or other written instructions and has not been modified without Seller's prior written approval.

(b) Should Seller determine, in its reasonable discretion, after its timely receipt of notice in the manner specified above, that any part of an item of Equipment is defective due to Seller's faulty materials or workmanship, Seller shall, at its expense, repair or replace (at Seller's sole option) such part and return the repaired/replacement part to Buyer. The provisions of this Warranty shall apply to the repaired/replacement part for the unexpired portion, if any, of the Warranty Period.

(c) In the event no Warranty Period is set forth on page 2 of this Agreement, then the Equipment described in this Agreement is provided to Buyer "AS IS/WHERE IS."

(d) THE FOREGOING WARRANTY, SET FORTH IN THIS SECTION IS SELLER'S SOLE AND EXCLUSIVE WARRANTY REGARDING THE EQUIPMENT, AND THERE ARE NO OTHER WARRANTIES (INCLUDING, WITHOUT LIMITATION, WARRANTIES FOR CONSUMABLES AND OTHER SUPPLIES), LIABILITIES OR GUARANTEES, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). BUYER, EXCEPT AS AFORESAID, SHALL HAVE NO CLAIM AGAINST SELLER OF ANY NATURE WHATSOEVER, WHETHER ARISING IN CONTRACT, TORT, NEGLIGENCE OF ANY DEGREE, STRICT LIABILITY OR OTHERWISE, WITH RESPECT TO THE EQUIPMENT OR ANY PART THEREOF DELIVERED HEREUNDER AND/OR WITH RESPECT TO ANY NON-CONFORMANCE OR DEFECT IN ANY SUCH EQUIPMENT AND/OR PART THEREOF DELIVERED HEREUNDER, INCLUDING BUT NOT LIMITED TO ANY LIABILITY OF SELLER FOR ANY CONSEQUENTIAL AND/OR INCIDENTAL DAMAGES AND/OR LOSSES (INCLUDING, WITHOUT LIMITATION, LOSS OF USE, REVENUE, AND/OR PROFITS), AND IN ANY EVENT, THE EXTENT OF SELLER'S MAXIMUM LIABILITY TO BUYER HEREUNDER SHALL NOT, UNDER ANY CIRCUMSTANCES, EXCEED THE COST OF REPAIRING OR REPLACING (AT SELLER'S SOLE OPTION) ANY PART/S FOUND TO BE DEFECTIVE WITHIN THE WARRANTY PERIOD AS AFORESAID.

(e) Without derogating from the above, if Seller, for any reason whatsoever, fails to perform, meet and/or fulfill, in respect of any item/s of Equipment, its obligations hereunder, and is unable to remedy such failure, then Seller's maximum aggregate liability (inclusive of any refund and/or remedy) for any losses or other damages incurred by Buyer and/or its customers (including, without limitation, consequential and/or incidental damages as well as loss of use and/or profits) shall not exceed the total amount paid by Buyer for such item(s) of Equipment.

9.  PATENT, TRADEMARK, AND COPYRIGHT INFRINGEMENT CLAIMS.

(a) Seller will defend, at its own expense, any action brought against Buyer to the extent that such action is based on a claim that the Equipment purchased and/or licensed from Seller hereunder infringes a patent, trademark, and/or copyright of the United States only, and Seller will pay those costs and damages finally awarded against Buyer in any such action which are attributable to any such claim.

(b) Such defense and payment are conditioned, however, on the following: (1) Seller will be notified promptly in writing by Buyer of any notice of such claim, (2) Seller will have sole control of the defense in any action on such claim and of all negotiations for its settlement or compromise and (3) should Seller's Equipment become, or in Seller's opinion be likely to become, the subject of a claim of infringement of any patent, trademark, and/or copyright, Seller will be entitled, at its sole option, to replace such Equipment, or to modify the same so that it becomes non-infringing, or to secure from the patent, trademark, or copyright holder (as the case may be) the right of unrestricted use of such patent, trademark, or copyright, or of the relevant Equipment, or to grant Buyer a credit for such Equipment (as depreciated) and accept its return.

(c) Buyer will indemnify and hold Seller (and/or Seller's parent or affiliated entities as the case may be) harmless from and against any claim of patent, trademark, and/or copyright infringement: (1) relating to the use or sale by Buyer of any of Seller's Equipment in any combination, method, process, or programming application and/or (2) arising out of compliance by Seller with modification specifications furnished by Buyer. In the event that any such claim is asserted against Seller, it will promptly notify Buyer of the assertion thereof and will permit Buyer to assume control of the litigation.

(d) Each party shall cooperate with the other and furnish all aid, information and assistance necessary to defend any such claim of infringement.

(e) Without derogating from the above, if Seller, for any reason whatsoever, fails to perform, meet and/or fulfill, in respect of any item/s of Equipment, its obligations hereunder, and is unable to remedy such failure, then Seller's maximum aggregate liability (inclusive of any refund and/or remedy) for any indemnification and/or losses or other damages incurred by Buyer and/or its customers (including, without limitation, consequential and/or incidental damages as well as loss of use and/or profits) shall not exceed the total amount paid by Buyer for such item(s) of Equipment.

(f) UNDER NO CIRCUMSTANCES SHALL BUYER HAVE A RIGHT TO RESCIND THIS AGREEMENT OR ITS PURCHASE OF THE EQUIPMENT IN CONNECTION WITH A CLAIM OF INFRINGEMENT AGAINST BUYER OR SELLER. THE FOREGOING STATES THE ENTIRE LIABILITY OF SELLER WITH RESPECT TO INFRINGEMENT OF PATENTS, TRADEMARKS, AND COPYRIGHTS BY SELLER'S EQUIPMENT OR ANY PARTS THEREOF.

10. SOFTWARE LICENSE. License Grant. Software that accompanies the Equipment or is identified as part of the Equipment may include Proprietary Components and/or Open Source Components that may each be subject to the license terms defined herein, and/or to separate, complementary or supplemental license terms that add to or modify the terms herein (collectively, "License Terms"). Proprietary Components and Open Source Components are referred to, collectively, as "Software". Proprietary Components are provided to Buyer (licensee) in binary form only. Open Source Components are provided or made available to Buyer (licensee) in binary and/or possibly source code form. All Proprietary Components and any part thereof, including, without limitation, documentation and any subsequent updates provided to Buyer by Seller, is licensed for use in binary form only on the single Indigo Equipment System on which the same is first installed. HP grants Buyer a license to Use one copy of the Proprietary Component(s) in the form that it is delivered to Buyer. The Software may be delivered in the respective form preloaded on a device, loaded on a CD, Internet download or other method of distribution. "Use" means storing, loading, installing, executing or displaying the Software. Buyer may not

Buyer's Initials: _MW_   Date: _12/5/02_

Indigo America, Inc. _RM_   Date: _4/30/03_

Revised October 2002 by ye

PURCHASE AND SALE AGREEMENT        TERMS AND CONDITIONS OF SALE        Page 5

modify, deconstruct, replicate, decompile, disassemble, reverse engineer or disable any licensing or control features of the Proprietary Component(s). If the Proprietary Component(s) is licensed for "concurrent use", Buyer may not allow more than the maximum number of authorized users to Use the Proprietary Component(s) concurrently.

The following additional provisions will apply in respect of the Software:
   a) Software is owned and copyrighted by Seller, its parent or affiliated companies and/or its third party suppliers. Neither this Agreement nor this license grant confers any title to, or ownership in, the Software and is not a sale of any rights in the Software. Seller's third party suppliers may protect their rights in the event of any violation of these License Terms.
   b) Buyer shall not make available the Proprietary Component(s), in any form, to any third party except Buyer's employees or agents directly concerned with Buyer's licensed use of the Software.
   c) Transfer. Buyer's license at least to the Proprietary Components will automatically terminate upon any transfer of the Proprietary Component(s). Upon transfer, you must deliver the Software, including any copies and related documentation, to the transferee. The transferee must accept these License Terms as a condition to the transfer.
   d) Seller may terminate your license at least to the Proprietary Components upon notice for failure to comply with any of these License Terms. Upon termination, Buyer must immediately return at least the Proprietary Components of the Software, together with all copies, adaptations and merged portions in any form.
   e) Any license terms that may be associated with any Open Source Components are applicable to and govern the respective Open Source Components as stated therein. Copies of such license terms are provided or made available to Buyer (licensee) as directed by such respective license agreement(s).

Without derogating from the above, Buyer hereby acknowledges that USA export restrictions as well as certain licensor's terms and conditions (e.g. those of Sun Microsystems, Inc. and Adobe Systems, Inc., where applicable) shall govern Buyer's use of a portion of the hardware and software comprising the Equipment sold or licensed hereunder.

11. TECHNICAL ADVICE AND ASSISTANCE. Seller's warranty shall not be enlarged, and no obligation or liability shall arise, as a result of Seller's rendering of technical advice, facilities or services in connection with Buyer's order for the Equipment furnished. Although any technical advice furnished, or recommendation made, by Seller or any representative of Seller concerning any use or application of any product is believed to be reliable, Seller makes no warranty, expressed or implied, of results to be obtained. Buyer assumes all responsibility for loss, damage, and/or personal injury resulting from the use of any such advice.

12. DISPUTES. The parties' agreement in respect of the Equipment shall be deemed to be entered into in Massachusetts and to be a Massachusetts contract and shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts. Seller and Buyer specifically agree that any legal action brought relating to Equipment, consumables and/or supplies purchased or relating to the parties' agreement in respect thereof will be commenced in Massachusetts within one (1) year after the relevant claim arises, failing which such claim shall be barred notwithstanding any longer statutory period of limitations. All objections to venue are hereby waived by both parties, and Buyer consents to service of process by certified mail addressed to the same address as that address designated for delivery of the Equipment purchased hereunder.

13. WAIVER. The failure of either party hereto, at any time, to require performance by the other party of any of its obligations hereunder shall in no way affect the full right to require such performance at any time thereafter. The waiver by either party hereto of any remedy with respect to a breach of any provision hereof shall not be taken as a waiver of a remedy with respect to any succeeding breach of such provision or any breach of any other provision.

14. SEVERABILITY. The parties agree that each provision contained in these Terms and Conditions of Sale shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. Moreover, if one or more of the provisions contained in these Terms and Conditions of Sale shall, for any reason, be held to be unenforceable, such provision or provisions shall be construed by the appropriate judicial body by limiting and reducing it or them, so as to be enforceable to the extent compatible with the applicable law.

15. CANCELLATION. Once accepted by Seller, this Agreement is not cancelable, in whole or in part, unless such cancellation is mutually agreed to in writing by both parties.

16. ASSIGNMENT. Seller may assign its obligations hereunder to Seller's parent or any subsidiary or other affiliated corporation or entity. Buyer shall not have the right to assign or transfer any of its rights or obligations under the agreement to any third party, without the prior written consent of Seller.

17. NO RESALE. Buyer is acquiring the Equipment for its own use and not for the purpose of resale, lease or other disposition.

18. INTEGRATION; MODIFICATION. The provisions hereof, including all attachments hereto, if any, represent the entire agreement between the parties with respect to the purchase and/or licensing of the Equipment, and cancel all prior understanding, written or oral. No amendment, waiver, or cancellation of any part of the Agreement shall be valid unless in writing and signed by an authorized representative of both parties.

19. PURCHASE ORDER. If a purchase order is issued by Buyer, or by any third party on behalf of Buyer, in connection with the purchase of the Equipment, none of the terms and conditions contained in such Purchase Order shall modify or supercede the terms and conditions of this Purchase and Sale Agreement. Seller's failure to object to terms contained in any such Purchase Order, or other communication from or on behalf of Buyer, shall not be a waiver of the terms set forth in this provision or in this Agreement.

20. HEADINGS. All headings or captions used herein are for convenience of reference only and shall not limit or define these terms and conditions.

21. CONFIDENTIAL AND PROPRIETARY INFORMATION. Any information, correspondence, drawings, manuals and other documents transmitted or communicated by Seller or the Manufacturer to Buyer and marked "confidential" or "proprietary," or which Buyer has reason to believe is such, shall be received and treated by Buyer in secrecy and confidence, and shall not be used by Buyer for any purpose except the purpose stated herein or otherwise authorized in writing by Seller, or disclosed by Buyer to any person or firm without the prior express written consent of Seller. Such confidential and proprietary information may be disseminated within Buyer's own organization only to the extent reasonably required for the proper operation of the System.

Buyer's Initials: _MW_    Date: _12/5/02_

Indigo America, Inc. _RM_    Date: _11/30/03_

*Revised October 2002 by tjc*