UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ADVANCED CARD SYSTEMS, INC. d/b/a SANDIA IMAGING, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 04 C 12295 NG |
| HEWLETT-PACKARD COMPANY and INDIGO AMERICA, INC. | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S AMENDED COMPLAINT**

NOW COMES Advanced Card Systems, Inc., d/b/a Sandia Imaging, a Texas corporation and complaining of Defendants Hewlett Packard Company, a Delaware corporation, and Indigo America, Inc., a Delaware corporation, states as follows.

I.  PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Advanced Card Systems, Inc. d/b/a Sandia Imaging ("Sandia") is a Texas corporation with its principal place of business in Arlington, Tarrant County, Texas.

2.  Defendant Hewlett Packard Company ("Hewlett Packard" or "HP") is a Delaware corporation doing business in Texas.

3.  Defendant Indigo America, Inc. ("Indigo") is a Delaware corporation related to HP and doing business in Texas. Both HP and Indigo manufacture, market, sell, distribute and service printing presses.

4.      This case was originally filed in the District Court of Tarrant County, Texas, 342nd Judicial District.  On September 24, 2004, Defendants removed this case pursuant to 28 U.S.C. § 1446(b).  Thereafter, the case was transferred on motion of Defendants to the United States District Court for the District of Massachusetts.

## II.  FACTS COMMON TO ALL COUNTS

5.      Sandia is a printing and distribution company, specializing in plastic card printing since 1998.  It has historically utilized an offset press, and continues to do so for some of its production.

6.      In 2002, Sandia sought to increase its production capacity and began exploring the products of several manufacturers, including Defendants.  Sandia also began negotiating with manufacturers of offset presses, which had historically fulfilled Sandia's needs and would have fit in Sandia's existing facility.

7.      During the summer of 2002, Defendants' agent and representative, Vince Pentella, solicited Sandia's business.  At all times, Pentella held himself out as an agent and representative of HP and Indigo.  He explained that Indigo was affiliated with HP, a leader in the field of printing and printing presses.  The two entities were indistinguishable in the agent's presentation.  Sandia reasonably and justifiably believed that both entities were responsible for the products being marketed.

8.      On November 22, 2002, the agent produced plastic cards, identical in design and thickness to Sandia's products, and represented that the cards had been digitally printed by Defendants' Indigo s2000 printing press ("s2000.")  The agent's cards were 30ml in thickness, industry standard for credit cards, and the identical thickness used by Sandia in its production of

135354-1                              2

plastic cards. A photocopy of the cards tendered to Sandia during Indigo's solicitation is attached hereto as Exhibit A.

9. Representations were also made by Defendants' agents that Sandia's costs associated with production of plastic cards would decrease by 50% using Indigo's digital press in lieu of the traditional offset press. Defendants represented that all necessary modifications and support would be provided to Sandia if it leased or purchased the s2000.

10. All of the foregoing promises and representations were material and were made to induce Sandia to purchase or lease the s2000, which Sandia would not have done had it known of the system's defects and lack of capabilities.

11. Sandia agreed to purchase the s2000 as a direct consequence of Defendants' representations to Sandia that the s2000 would provide: (1) excellent quality printing; (2) a lower production cost for finished products than Sandia's existing offset printing cost; (3) capabilities for printing 30 ml plastic cards to fit Sandia's needs; and (4) a total investment for the complete system which was equivalent to the purchase of an offset printing press.

12. Defendants were informed, prior to the purchase, that in order to accommodate the s2000 and the accompanying lamination machine and cutting machine, it would be necessary for Sandia to obtain a larger facility. Sandia did in fact obtain a larger facility, despite 20 months remaining on its existing lease. In addition to a larger facility, Sandia also had to build a contained humidity- and temperature-controlled area in the new facility to accommodate the requirements of the s2000. All of the consequential expenses were known to Defendants. Sandia entered into a Purchase and Sales Agreement with Defendants on December 5, 2002, whereby Sandia agreed to purchase the s2000 for $334,000. A financing lease was signed with

HP Financial Services on December 17, 2002. Copies of the Purchase and Sales Agreement and financing lease are attached hereto as Exhibits B and C.

13. Consistent with the discussions between the parties prior to the purchase, Sandia contracted to lease a new, larger manufacturing facility on January 1, 2003. Sandia also acquired from other sources a laminating machine and two punching machines, necessary for the s2000 process, but unnecessary for the offset printing Sandia had done in the past.

14. The s2000 was delivered to and installed at Sandia's premises on or about March 15, 2003. Despite the numerous representations of Defendants, the s2000 was unable, when delivered, to process printing on 30 ml plastic as promised. Because the s2000 was unable to process the 30 ml cards, Sandia was forced to engage in an expensive alternative process utilizing two sets of substrate plastic. Additionally, Sandia was caused to employ expensive and complicated modifications, increasing the cost of production beyond that projected by Defendants, such as the need for a tacking station to stabilize the substrata.

15. Sandia made numerous complaints to Defendants about the defects in the system. Defendants responded with promises to correct the s2000 and retrofit the system with modifications to enable it to print on the 30ml cards. The modifications were first promised by February 2003. When they were not delivered, they were promised by April 2003 and then by May 2003. Despite the succession of promises, the modifications were never delivered. In fact, there were no modifications that Defendants had, or knew of, which would allow the s2000 to operate properly. The promises were made to induce Sandia not to cancel the Purchase Agreement.

16. On August 25, 2003, Sandia's president, Betrand Pelletier, sent a letter to Defendant Indigo's national sales manager, Vince Pentella, again setting forth the problems and

defects Sandia was experiencing with the s2000.  A copy of the August 25, 2003 letter is attached hereto as Exhibit D.  However, just as in months past, Defendants failed to remedy the defects.

17. Lease payments were scheduled to commence to HP Financial in August 2003. Because of the system's defects, and as part of Defendants' ongoing scheme to keep Sandia from canceling the contract and asserting a claim against Defendants, the lease commencement was postponed to March 2004.

18. By October 2003, the system was still defective and Sandia's financial losses had become critical.  While Sandia contemplated its legal alternatives, Defendants proposed a letter agreement.  The letter agreement was tendered with the understanding that Defendants would promptly correct the defect and retrofit the system with capability to print on 30ml cards. Defendants never intended to retrofit the machine, but only made these promises as part of Defendants continuing scheme to prevent Sandia from canceling the contract and pursuing its claim against Defendants.

19. In the letter agreement, the Defendants promised, *inter alia*:  1) to pay $13,000.00 to Sandia; 2) to commence a Shared Maintenance Service for twelve months, from October 2003 to October 2004, at no cost to Sandia; and 3) to provide a "Thick Substrates Kit", which HP professed it was developing and which the parties understood would process a 30ml plastic card. The letter was proposed and prepared by Defendants and also contained a provision whereby Sandia would release Defendants from "any and all claims or damages."  The letter also contained a condition subsequent by which Sandia could elect to void the agreement "*ab initio*."

20. Sandia signed Defendants letter agreement on October 27, 2003.  It was signed by George Krikorian of Hewlett Packard, on behalf of Defendants.  Defendants never supplied the

retrofit or the Thick Substrates Kit that would process 30ml plastic cards.  The system is still defective.  Sandia elected to void the letter agreement and took those steps required by the agreement to exercise the condition subsequent.

### III. CAUSES OF ACTION

#### FRAUD and FRAUD IN THE INDUCEMENT

21.     The promises made by Defendants, as aforesaid, were material, false and made with knowledge of their falsity.  They were made to induce Sandia to forego its rights to cancel the contract and seek damages from Defendants.  The promises were part of an ongoing scheme to defraud Sandia.  Although presented with physical specimens of 30ml cards, bearing the legend "digitally printed on an HP s2000 Indigo Press," Defendants knew such representations were false and that the system could not perform without further modifications, which were undeveloped.  Continuing representations, including the letter agreement, promised delivery of these modifications when there was no basis for such representations.   Defendants intended for Sandia to rely on such representations, which Sandia reasonably did, and suffered damages proximately caused by such reliance.

#### NEGLIGENT MISREPRESENTATION

22.     Alternatively, the promises made by Defendants, as aforesaid, were material, false and made in negligent or reckless disregard to their truth.  They were made to induce Sandia to forego its rights to cancel the contract and seek damages from Defendants. The promises were part of an ongoing solicitation to mislead Sandia into believing that the s2000 would process Sandia's business.  Although presented with physical specimens of 30ml cards, bearing the legend "digitally printed on an HP s2000 Indigo Press," Defendants negligently made such representations without confirming with the appropriate technology people within Defendants'

135354-1                                                           6

companies as to whether the system could perform as promised without further modifications, or whether such developments were immediately forthcoming. Continuing representations, including the letter agreement, promised delivery of these modifications when there was no basis for such representations. Defendants intended for Sandia to rely on such representations, which Sandia did, and suffered damages proximately caused by such reliance.

BREACH OF CONTRACT

23.     Additionally or alternatively, if necessary, the one or several contracts between the parties have been breached by the Defendants. Defendants HP and Indigo have failed to perform their obligations and deliver the system compatible with the express warranty that it conform to the samples and the implied warranty that it be fit for Sandia's particular purpose of processing 30 ml cards. The delivery of the sample cards created an express warranty that the s2000 would produce cards that would conform to the sample. The sample cards became a part of the basis of the bargain and Defendants continuous promises to repair and modify the s2000 also became a basis of the bargain which created an express warranty that the s2000 would be capable of processing cards to conform to the samples. It was a basic fundamental understanding of the parties that the Defendants would deliver a machine that would process 30 ml plastic cards. At the time of entering into the Purchase and Sales Agreement, Defendants clearly knew that Sandia's business consisted of producing 30 ml cards and that for its business purposes Sandia required a machine to process cards of that particular thickness. Defendants' knowledge and understanding of Sandia's business needs created an implied warranty of fitness for a particular purpose. Further, the Purchase and Sales Agreement provided for a remedy to repair or replace any defective part. The warranty provision of the agreement provided that the warranty period would be for 3 months commencing on the date of installation and extend to 6

months if Sandia contemporaneously signed a Shared Maintenance Agreement and completed a Shared Maintenance Training Course.  Sandia executed a Shared Maintenance Agreement and one of its employees successfully completed the training course thereby extending the warranty period for 6 months to on or about September 15, 2003.  A copy the certificate of completion of the training course is attached hereto as Exhibit E.  Sandia continuously and in a timely manner complained to Defendants of the s2000's lack of conformity, in both oral and written communications, but Defendants failed to repair or modify the machine.  Defendants' failures to modify and repair the system constitute material breaches of contract.

## IV.  DAMAGES

24.     Sandia here sues to recover its actual damages in an amount in excess of $500,000, exclusive of costs or interest.

25.     Sandia also sues to recover punitive damages, including attorneys' fees as a part of punitive damages, in a reasonable sum.

## V.  JURY DEMAND

26.     Plaintiff demands a trial by jury on all issues.

                Respectfully submitted,
                ADVANCED CARD SYSTEMS, INC.
                d/b/a SANDIA IMAGING
                by its attorneys,


                /s/ John T. Hugo
                John T. Hugo, BBO # 567262
                Jennifer B. Furey, BBO # 634174
                COOLEY MANION JONES LLP
                21 Custom House Street
                Boston, MA 02110
                (617) 737-3100
                facsimile (617) 737-0374

                and

        Frank Hill
        HILL GILSTRAP
        1400 W. Abram St.
        Arlington, TX 76013
        (817) 261-2222
        facsimile: (817) 274-9724