# United States District Court
# District of Massachusetts

ADVANCED CARD SYSTEMS, INC.
   d/b/a SANDIA IMAGING,
      Plaintiff,

       v.               CIVIL ACTION NO. 04-CV-12295-NG

HEWLETT-PACKARD COMPANY
and INDIGO AMERICA, INC.
      Defendants.

## *REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS (#14)*

COLLINGS, U.S.M.J.

### *I. Introduction*

On or about August 24, 2004, plaintiff Advanced Card Systems, Inc. d/b/a Sandia Imaging ("Sandia" or "plaintiff") filed an action against defendants Hewlett-Packard Company ("HP") and Indigo America, Inc. ("Indigo") (collectively, "defendants") in state court in the District Court of Tarrant County, Texas.  On or about September 24, 2004, defendants removed

the action to federal court in the Northern District of Texas, Forth Worth Division.  Then, on or about October 1, 2004, defendants moved to the dismiss the action for improper venue or to transfer venue to Massachusetts.  On or about October 22, 2004, after considering an agreement reached by the parties with regard to venue, the Texas court transferred the action to this Court.

The gist of plaintiff's action is that defendants breached a contract with plaintiff to sell plaintiff a working digital press that plaintiff planned to use to produce plastic cards.  Specifically, plaintiff has asserted claims for fraud, negligent misrepresentation and breach of contract[1].  Pursuant to Fed. R. Civ. 12(b)(6), defendants have moved to dismiss all of plaintiff's claims on various grounds.  In support, defendants filed a Memorandum (#15) and a Reply Memorandum (#23).  Plaintiff in turn filed a Response to Defendants' Memorandum in Support of its Motion to Dismiss (#19) and a Sur-reply to Defendants' Motion to Dismiss (#27).

---

[1]

Originally plaintiff lodged claims for negligence, breach of contract, declaratory judgment, and fraud. However, on December 27, 2004, plaintiff filed an Amended Complaint eliminating the claims for negligence and declaratory judgment and adding the negligent misrepresentation claim.  The Amended Complaint is the operative complaint and shall be referred to herein as the "complaint."  Plaintiff was not required to obtain leave of court to file its Amended Complaint because under Fed. R. Civ. P. 15(a), a party may file an amended pleading once without leave of court if no responsive pleading has been filed.  The First Circuit has stated that "[n]either a motion to dismiss nor one for summary judgment is a responsive pleading for purposes of Rule 15(a)." *McDonald v. Hall*, 579 F.2d 120, 121 (1 Cir., 1978)(citations omitted).

Defendants' motion has been referred to the undersigned for issuance of a Report and Recommendation (Order of Reference #21).  For the reasons discussed below, the Court shall recommend that defendants' motion to dismiss be denied.

## II.  The Standard

The standard to be applied when deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., is familiar.  In the oft-cited words of the Supreme Court, "a complaint should not be dismissed for failure to state  a claim unless it appears beyond doubt that the [non-moving party] can prove no set of facts in support of his claims that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957) (footnote omitted).  When addressing a motion to dismiss, it is incumbent upon the Court to "...'tak[e] the allegations in the complaint as true and mak[e] all reasonable inferences in favor of plaintiff.'" *Doran v. Mass. Turnpike Auth.*, 348 F.3d 315, 318 (1 Cir., 2003), *cert. denied,* 541 U.S. 1031 (2004), citing *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 255 (1 Cir., 1994). That general proposition notwithstanding, "bald assertions, . . . subjective characterizations, optimistic predications, or problematic suppositions" need not be credited.   *United States v. AVX Corp.*, 962 F.2d 108, 115 (1 Cir.,

3

1992)(internal quotations omitted); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 224 (1 Cir., 2004), *cert. denied*, 125 S.Ct. 59 (2004).

"A motion to dismiss pursuant to Rule 12(b)(6) is a threshold challenge by one party to the adequacy of one or more claims set forth in another party's complaint." *Eggert v. Merrimac Paper Co., Inc. Leveraged Employee Stock Ownership Plan and Trust ("The ESOP")*, 311 F. Supp.2d 245, 247 (D. Mass., 2004), citing *Burchill v. Unumprovident Corp.*, 2003 WL 21524730, *1 (D. Me., June 27, 2003). Moving under Rule 12(b)(6), a party asserts that an opponent's claims are unavailing "because the underlying allegations, even if true, fail to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In short, "[t]he appropriate inquiry on a motion to dismiss is whether, based on the allegations of the complaint, the plaintiffs are entitled to offer evidence in support of their claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, (1974)(abrogated on different grounds by *Harlow v. Fitzgerald,* 457 U.S. 800 (1982).

### III.  Facts

As is required at this stage in the proceedings, the Court construes the allegations in the complaint as true for purposes of ruling on defendants' motion

to dismiss.

Plaintiff is a printing and distribution company, specializing in plastic card printing. (Amended Complaint #18 ¶ 5) In 2002, plaintiff sought to increase its production capacity and began exploring the products of several manufacturers including defendants. (#18 ¶ 6)  In 2002, defendants' agent and representative, Vince Pentella ("Pentella"), solicited plaintiff's business. (#18 ¶ 7)  At all times, Pentella held himself out as an agent and representative of HP and Indigo. (#18 ¶ 7)

On November 22, 2002, Pentella produced plastic cards, identical in design and thickness to plaintiff's products and represented that the cards had been digitally printed by defendants' Indigo s2000 printing press ("s2000"). (#18 ¶ 8) The cards were 30ml in thickness, industry standard for credit cards and the identical thickness used by plaintiff in its production of plastic cards. (#18 ¶ 8)

Defendants represented that plaintiff's costs associated with the production of plastic cards would decrease by 50% using Indigo's digital press instead of the traditional offset press. (#18 ¶ 9) Defendants further represented that all necessary modifications and support would be provided to plaintiff if it

leased or purchased the s2000. (#18 ¶ 9)

Defendants were informed, prior to the purchase of the s2000, that in order to accommodate the s2000 and the accompanying machines, it would be necessary for plaintiff to obtain a larger facility. (#18 ¶ 12) Plaintiff did obtain a larger facility, despite 20 months left on its existing lease and also built a humidity and temperature-controlled area in the new building to accommodate the requirements of the s2000. (#18 ¶ 12)

Plaintiff entered into a purchase and sale agreement ("p&s") with defendants on December 5, 2002 pursuant to which plaintiff agreed to purchase the s2000 for $334,000. (#18 ¶ 12)  Plaintiff signed a financing lease with HP Financial Services on December 17, 2002. (#18 ¶ 12)

Plaintiff contracted to lease a new, larger manufacturing facility on January 1, 2003 and also acquired a laminating machine and two punching machines, necessary for the s2000 process but unnecessary for the offset printing plaintiff had previously done. (#18 ¶ 13) The s2000 was delivered to and installed at plaintiff's premises on or about March 15, 2003. (#18 ¶ 14) When delivered, the s2000 was unable to process printing on 30ml plastic. (#18 ¶ 14) Thus, plaintiff was forced to engage in an expensive alternative process

using two sets of substrate plastic, and plaintiff had to employ expensive and complicated modifications, such as the need for a tacking station to stabilize the substrata. (#18 ¶ 14)

Plaintiff made numerous complaints to defendants about the defects in the system. (#18 ¶ 15) Defendants responded with promises to correct the s2000 and retrofit the system with modifications to enable it to print on the 30ml cards. (#18 ¶ 15) The modifications were first promised by February 2003 and when they were not delivered, they were promised by April 2003, then May 2003. (#18 ¶ 15) The modifications were never delivered. (#18 ¶ 15)

On August 25, 2003, plaintiff's president, Bertrand Pelletier ("Pelletier"), sent a letter to Indigo's national sales manager, Pentella, setting forth the problems that plaintiff was experiencing with the s2000, but defendants still failed to remedy the problems. (#18 ¶ 16) Lease payments were scheduled to commence to HP Financial in August 2003, but because of the system's defects, the lease commencement was postponed to March 2004. (#18 ¶ 17)

In October 2003, defendants proposed a letter agreement (the "agreement") to address the problems with the s2000. (#18 ¶ 18) The agreement was tendered with the understanding that defendants would

7

promptly correct the defects and retrofit the s2000 with the capability to print on 30ml cards. (#18 ¶ 18) In the agreement, defendants promised to *inter alia*: 1) pay $13,000 to plaintiff; 2) commence a Shared Maintenance Service for twelve months at no cost to plaintiff; 3) provide a "Thick Substrates Kit" which HP said it was developing and which the parties understood would process a 30ml plastic card. (#18 ¶ 19)

The agreement was proposed and prepared by defendants and contained a provision whereby plaintiff would release defendants from "any and all claims and damages relating to or arising from the Purchase and Sale Agreement" and another provision whereby the agreement would be void "*ab initio*" if plaintiff failed to comply with the confidentiality requirements of the agreement. (#18 ¶ 19)(quoting the agreement which is attached as Exh. 4 to #19) The agreement also stated that it "serves to follow up on our agreement to resolve all outstanding customer satisfaction issues between Indigo...and Sandia...related to the...s2000 purchased by Sandia...." (#19, Exh. 4)

George Krikorian of HP signed the agreement on October 27, 2003 on behalf of defendants and plaintiff signed the agreement on November 7, 2003[2].

---

2

In the complaint, plaintiff states that it signed the agreement on October 27, 2003, but a copy of the agreement reflects that plaintiff actually signed the agreement on November 7, 2003. (*See* #19, Exh. 4) The

(#18 ¶ 20) Defendants never supplied the retrofit or the Thick Substrates Kit that would allow the s2000 to process 30ml plastic cards. (#18 ¶ 20) The s2000 system is still defective. (#18 ¶ 20) Plaintiff contends that it elected to void the agreement by purposely failing to comply with the confidentiality requirements of the agreement. (#18 ¶ 20)

## IV.  Analysis

Defendants have moved to dismiss the complaint on various grounds. First, defendants assert that plaintiff's claims have been "explicitly settled and released by Sandia in the settlement agreement into which Sandia entered with the defendants." (#15 at 1) Second, defendants argue that the claims should be dismissed as against HP because "HP was not involved in the disputed transactions." (#15 at 1) Third, defendants assert that the claims are barred by the one year time provision in the Purchase and Sale Agreement. (#23 at 3) Next, according to defendants, the fraud claims should be dismissed because plaintiff "has failed to plead the alleged fraud with the required specificity." (#15 at 2) Finally, defendants contend that the negligence and breach of contract claims must be dismissed "because of the warranty and limitation of

---

actual date that plaintiff executed the agreement is not relevant for purposes of ruling on the motion to dismiss.

liability provisions in the Purchase and Sale Agreement and the two maintenance agreements between Indigo and Sandia." (#15 at 1-2)  All of defendants' contentions will be addressed below.

Before turning to the issue of whether or not plaintiff's claims should be dismissed, however, it is necessary to determine which documents outside of the complaint the Court can consider in reaching a decision on the motion to dismiss.  Plaintiff attached five exhibits to its complaint, including the p&s and a letter from Sandia to Indigo.  Defendants then attached to their memorandum seven exhibits, including the agreement, various correspondence between the parties, the so-called Click and Shared Maintenance Agreement ("maintenance agreement"), and the so-called Business Builder Program Agreement ("business builder agreement").  Then, both plaintiff and defendants attached additional exhibits to their reply and sur-reply memoranda respectively.  Plaintiff argues that the Court should review only those documents attached to the complaint and not surprisingly, defendants contend that the Court should consider all attached documents.

The law is clear in the First Circuit that "when a complaint's factual allegations are expressly linked to–and admittedly dependent upon–a document

(the authenticity of which is not challenged), then the court can review it upon a motion to dismiss." *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 38 (1 Cir., 2005)(internal quotations and citations omitted); *see also Quaak v. Dexia S.A.*, 357 F. Supp.2d 330, 339 (D. Mass., 2005)(holding that certain articles which were not referred to in the complaint or central to the allegations in the complaint had too "tenuous" a connection to be considered at the motion to dismiss stage).

In the case at bar, the Court shall review the five exhibits attached to the complaint as well as the agreement which is appended to defendants' memorandum since the complaint's allegations are expressly linked to the agreement. At this juncture, the Court need not consider any additional documents since the complaint's allegations do not hinge on those other documents.

### A. Count I: "Fraud and Fraud in the Inducement"

#### 1. Failure to State a Claim

In order to state a claim for fraud[]..., the plaintiff must allege:

(1) that the statement was knowingly false; (2) that [defendants] made the false statement with the intent to deceive; (3) that the statement was material to the

> plaintiffs' decision . . . ; (4)   that the plaintiffs
> reasonably relied on the statement; and (5)  that the
> plaintiffs were injured as a result of their reliance.

*Doyle v. Hasbro, Inc.*, 103 F.3d 186, 193 (1 Cir., 1996), quoting *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1 Cir., 1986); *see also Johnson v. Brown & Williamson Tobacco Corp.*, 122 F. Supp.2d 194, 207 (D. Mass., 2000).

A claim for fraudulent inducement requires that the plaintiff allege the same elements. *See Elias Bros. Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F. Supp. 920, 922 (D. Mass., 1993).

The complaint adequately pleads a misrepresentation claim.  It contends that defendants made various knowingly false promises and misrepresentations to induce plaintiff to purchase or lease the s2000, including that all necessary modifications and support would be provided if plaintiff leased or purchased the s2000. (#18 ¶¶ 9, 10, 21) It further alleges that such representations were material, that defendants intended for plaintiff to rely on the representations and that plaintiff did rely on them and suffered damages proximately caused by such reliance. (#18 ¶ 21)  Accordingly, the complaint adequately pleads the elements of a misrepresentation or fraudulent inducement claim.

### 2. *Rule 9(b), Fed. R. Civ. P.*

Defendants also seek dismissal of Count I on the grounds that it fails to

satisfy Rule 9(b), Fed. R. Civ. P.  Rule 9(b) states that "[i]n all averments of

fraud or mistake, the circumstances constituting fraud or mistake shall be stated

with particularity."  Fed. R. Civ. P. 9(b).  It is well-established that:

> Rule 9 imposes a heightened pleading requirement for
> allegations of fraud in order to give notice to
> defendants of plaintiffs' claim, to protect defendants
> whose reputation may be harmed by meritless claims
> of fraud, to discourage 'strike suits,' and to prevent the
> filing of suits that simply hope to uncover relevant
> information during discovery.

*Doyle*, 103 F.3d at 194.

Rule 9(b) applies to misrepresentation claims.  *See Lindner Dividend Fund, Inc.*

*v. Ernst & Young*, 880 F. Supp. 49, 57 (D. Mass., 1995) (negligent

misrepresentation claim).

"The First Circuit has interpreted Rule 9(b) to require 'specification of the

time, place, and content of an alleged false representation.'"  *Johnson*, 122 F.

Supp.2d at 207, quoting *Doyle*, 103 F.3d at 194; *see also Bio-Vita, Ltd. v.*

*Rausch*, 759 F. Supp. 33, 37 (D. Mass., 1991) (the First Circuit "strictly applies

the particularity requirements of Rule 9(b).").  General temporal references

such as "in the course of the negotiations" or "from the beginning of the

negotiations and continuously thereafter" do not satisfy Rule 9(b)'s requirement

13

of specificity with respect to the time of an alleged false representation.  *See Bio-Vita, Ltd.*, 759 F. Supp. at 37 & n. 8.

Construing the complaint in the light most favorable to plaintiff, it just barely pleads fraud with the level of particularity required by Rule 9(b).  The one purportedly fraudulent misrepresentation which is specifically identified in the complaint is that cards which were 30ml in thickness, samples of which were provided to plaintiff during Indigo's solicitation of plaintiff, had been digitally printed on the s2000. (#18 at 8)  This representation was allegedly made on November 22, 2002 by Pentella. (#18 ¶¶ 7-8) Thus, the requisite time, place[3] and content have been provided.

Plaintiff also makes general allegations that defendants represented that all necessary modifications and support would be provided to plaintiff if plaintiff leased or purchased the s2000 and that promised modifications were never made after the s2000 was shown to have problems. (#18 ¶¶ 9, 15, 18) Although the complaint states in general terms what the misrepresentations were, it fails to specify *when* or *where* they were made or even who made the

---

[3]

      While the place of the misrepresentation could have been more explicitly identified, it is clear from the complaint exactly when the misrepresentation took place and that it occurred during a meeting in which Indigo was soliciting plaintiff's business.  Thus, the misrepresentation has been identified with sufficient particularity.

misrepresentations. It can be inferred that the first such statement was made sometime in 2002 and that the statement promising modifications was made in 2003, but general temporal statements are inadequate. *See Bio-Vita, Ltd.*, 759 F. Supp. at 37 & n. 8.

Therefore, the only alleged misrepresentation in the complaint that satisfies Rule 9(b) is that the s2000 was able digitally to print cards on 30ml plastic. This is enough, however, for the Court to conclude that Count I should not be dismissed for failure to plead fraud with the requisite specificity. However, all fraud claims based on any other misrepresentations must be dismissed for failure to comply with Rule 9(b). It will be up to the plaintiff as to whether to seek to amend the complaint further to set forth fraud claims which comply with Rule 9(b) in addition to the one which the Court has ruled survives the motion to dismiss.

### 3. *Claims are barred by the agreement*

Defendants, however, also posit that the fraud claim (as well as the other claims) should be dismissed because plaintiff explicitly settled and released those claims in the agreement.[4] In sum, defendants argue that any claims in the

---

[4]

Defendants also argue that the claims as against HP should be dismissed because HP was not involved in the disputed transactions. (#15 at 1) Viewing the allegations in the light most favorable to

complaint were released by plaintiff when plaintiff signed the agreement which set out, in relevant part, that its purpose was to "resolve all outstanding customer service issues," "all outstanding matters" between HP, Indigo and Sandia and further set forth that Sandia agreed to release HP from "any and all claims or damages relating to or arising from the" p&s. (#15 at 9; #15, Exh. 4)

Plaintiff responds by arguing that the agreement indeed bars claims outstanding at the time the agreement was signed but does not serve to bar claims that arose as a result of defendants' allegedly continuing fraudulent conduct. Plaintiff goes on to contend that the agreement was part and parcel of defendants' scheme to defraud plaintiff and as such cannot be a bar to plaintiff's claims. Finally, plaintiff argues that the agreement is void because plaintiff chose not to keep the terms of the agreement confidential, a condition which, according to its terms, rendered such agreement void *ab initio*.

As discussed above, the Court shall consider the terms of the agreement in reaching a decision on the instant motion. The agreement clearly reflects that:

---

plaintiff, the Court cannot conclude that HP was not an involved party. Plaintiff has sufficiently alleged that HP did take part in the transactions, just as Indigo did. (*See, e.g.,* #18 ¶ 7 ("Pentella held himself out as an agent and representative of HP and Indigo); #18 ¶ 20 (the agreement "was signed by George Krikorian of [HP], on behalf of all Defendants."), #15, Exh. 4 (settlement agreement resolving all matters between HP Indigo and plaintiff)). Thus, the Court shall not recommend that the claims be dismissed against HP on the grounds that HP was not involved in the events giving rise to this action.

·    plaintiff shall release HP "from any and all claims relating to or arising from the Purchase and Sale Agreement";

·    it serves to take care of "all outstanding matters between HP Indigo and Sandia"; and

·    it shall resolve "all outstanding customer satisfaction issues between" Indigo and Sandia "related to the...s2000 purchased by Sandia" under the p&s.

It is "a basic tenet of contract interpretation that 'where the wording of the contract is unambiguous, the contract must be enforced according to its terms.'" *Cozza v. Network Associates, Inc.*, 2005 WL 1377877, *4 (D. Mass., June 9, 2005), quoting *Pride Hyundai, Inc. v. Chrysler Financial Co., L.L.C.*, 369 F.3d 603, 616 (1 Cir., 2004), quoting *Liberty Mut. Ins. Co. v. Gibbs*, 773 F.2d 15, 17 (1 Cir., 1985).  Moreover, "[c]ontract interpretation questions...are ordinarily questions of law for a court" and if "a contract is unambiguous, the court should decide its proper interpretation." *Nadherny v. Roseland Property Co., Inc.*, 390 F.3d 44, 48 (1 Cir., 2004).

Thus, in the instant case, upon first reflection, it would appear that based on the unambiguous terms of the agreement that plaintiff would be barred from bringing suit against defendants because it released all claims[5] against

---

5

Plaintiff's argument that in the agreement it released only outstanding issues between it and defendants (and not *all* claims including those that have not yet arisen) is seemingly contradicted by the

defendants arising from the purchase of the s2000.  However, the agreement also explicitly sets forth that "[i]n the event Sandia fails to comply with [the] confidentiality requirement [set out in the agreement], this [agreement] shall become void *ab initio* and HP Indigo shall have the right to invoice Sandia...." (#15, Exh. 4 at 2)  It is undisputed that plaintiff failed to comply with the confidentiality provisions of the agreement.  Nevertheless, defendants argue that "only Indigo possessed the right to void the agreement if Sandia breached its confidentiality provisions." Defendants posit additionally that plaintiff's conduct of purposely breaching the confidentiality requirements of the agreement so that such agreement would be void is barred by the doctrine of unclean hands. (#15 at 14)

Unfortunately for defendants, the agreement is unambiguous in stating that if plaintiff failed to comply with the confidentiality provisions then the agreement would be void *ab initio*.  There is absolutely nothing in the agreement to the effect that only Indigo had the right to void the agreement if plaintiff did not comply with the confidentiality requirements. In short, plaintiff did not comply with such requirements and therefore, according to its terms,

---

terms of the agreement.

18

the agreement is void *ab initio* and defendants have the right to invoice plaintiff. Thus, the Court shall not recommend that the complaint be dismissed on the grounds that the settlement agreement bars claims by plaintiff.

### 4.   *Claims are barred by the statute of limitations in the P&S*

Defendants assert that all of plaintiff's claims are barred by the statute of limitation provision of the p&s. (#15 at 11-13; #23 at 10-15) Specifically, defendants argue that Section 12 of the p&s bars plaintiff from bringing suit because it did not do so within the requisite one year time frame.  Section 12 sets out, in relevant part, that:

> Seller and Buyer specifically agree that any legal action brought relating to the Equipment [i.e., the s2000]... will be commenced in Massachusetts within one (1) year after the relevant claim arises, failing which such claim shall be barred notwithstanding any longer statutory period of limitations.

The parties go to great lengths in their papers arguing over when the so-called relevant claims arose, with defendants contending that the claims arose when the s2000 was delivered on March 15, 2003 and plaintiff asserting that the relevant claims arose much later, only after defendants failed properly to retrofit the s2000.  When the claims actually "arose" will hinge on plaintiff's awareness of the problems with the s2000 and plaintiff's communications to

19

defendants about those problems as well as on other facts. In sum, proper determination of when plaintiff's claims arose will require discovery and development of the factual record. Thus, dismissal on the basis of the statute of limitations provision in the p&s is not appropriate as it is an issue that would more properly be resolved at the summary judgment stage.

### B.    Count II: Negligent Misrepresentation

"Negligent misrepresentation is, in almost all respects, the same as fraud except (1) that a party claiming negligent misrepresentation need show only that the defendant negligently, rather than intentionally, misstated a material fact, and (2) the parties were in privity of contract or the defendant had actual knowledge of the plaintiff's reliance." *Galvin v. Gillette Co.*, 2005 WL 1476895, * 2 (Mass. Super., May 19, 2005). Plaintiff has adequately stated a claim for negligent misrepresentation in that it has alleged that defendants misstated (either negligently or intentionally) material facts (#18 ¶¶ 8-9) and that the parties were in privity of contract. (#18 ¶ 12)

In addition, the negligent misrepresentation claim should not be dismissed for the reasons set forth in the section addressing the fraud claims. However, as to the negligent misrepresentation claim (as well as the breach of contract claim, below), defendants have put forth an additional argument–that

is, that the claims should be dismissed based on the warranty and limitation of

liability provisions in the p&s.

Defendants rely on Section 8 of the p&s to support their argument.  That

section states, in pertinent part, that

> (a) Seller warrants, for the Warranty Period described in this Agreement, each item of Equipment against defects arising from Seller's faulty materials and workmanship, provided that (1) Seller has received, prior to the end of the Warranty Period specified herein, written notice regarding a defective part of an item of Equipment, (2) Buyer has afforded Seller prompt and reasonable opportunity to inspect any part as to which any claim is being made... (b) Should Seller determine, in its reasonable discretion, after its timely receipt of notice in the manner specified above, that any part of an item of Equipment is defective due to Seller's faulty materials or workmanship, Seller shall, at its expense, repair or replace...such part....

The warranty period referenced above is set out on page 2 of the p&s:

> Seller agrees to provide Buyer with a three (3) month warranty (the "Warranty Period") on the Equipment.  In addition, Seller will provide Buyer with an additional three (3) months of warranty, thereby extending the Warranty Period to a total of six (6) months if Buyer (i) contemporaneously with the execution of this Purchase and Sale Agreement, executes a one (1) year agreement for Seller's Shared Maintenance of the Equipment and (ii) completes the required Shared Maintenance Training Course with six (6) months of Seller's completion of installation of the Equipment.  In either event, the Warranty Period shall be deemed to have commenced upon Seller's certification of completion of installation of the Equipment.

21

Additionally, the limitation of liability provision in the p&s states that other than the explicit warranty, "THERE ARE NO OTHER WARRANTIES...LIABILITIES, OR GUARANTEES" and that "BUYER...SHALL HAVE NO CLAIM AGAINST SELLER OF ANY NATURE WHATSOEVER, WHETHER ARISING IN CONTRACT, TORT, NEGLIGENCE OF ANY DEGREE, STRICT LIABILITY OR OTHERWISE, WITH RESPECT TO THE EQUIPMENT OR ANY PART THEREOF...." (#18, Exh. B, ¶ 8(d)) (capitals in original).

Defendants claim that under the warranty clause of the p&s, plaintiff had until June 15, 2003 "to provide written notice of, or to assert, any claim concerning the Equipment." (#15 at 11) Defendants apparently use the June 15, 2003 date because the s2000 was installed at plaintiff's premises on March 15, 2003 (*see* #18 ¶ 14) and the p&s contains a three month warranty (or a six month warranty if certain conditions are met). Defendants then assert that plaintiff did not provide defendants with written notice of any problems before June 15, 2003. (#15 at 12-13) Further, defendants argue that the limitation of liability clause is unambiguous and as such clearly bars plaintiff from bringing suit against defendants. (#15 at 12)

Plaintiff, on the other hand, argues first that it was the six month warranty period, not the three month warranty period, that controlled because

plaintiff fulfilled the requisite preconditions to extend the warranty period--
execution of the maintenance agreement and completion of the training course--
and second that plaintiff repeatedly notified defendants of the deficiencies and
problems with the s2000 within the warranty period. (#19 at 7) Additionally,
plaintiff asserts that the limitation of liability provision is invalid because it is
unconscionable. (#19 at 8) Specifically, plaintiff's contention is that the
provision is unconscionable because it left plaintiff without "minimum adequate
remedies" and thus failed of its essential purpose.  In sum, says plaintiff, it was
left without a minimum adequate remedy because defendants never conformed
the s2000 to print on 30ml substrate. (#19 at 9) In addition, plaintiff argues
that the limitation of liability provision would be unenforceable if plaintiff
succeeds in proving its fraudulent inducement claim. (#19 at 10)

Resolution of whether the warranty and limitation of liability provisions
bar plaintiff from bringing suit against defendants is not well-suited for a
motion to dismiss.  There are far too many factual disputes that require
discovery and a more developed record prior to a determination of whether the
warranty clause applied in this case and if so, what the warranty period was.
For example, there is the issue of whether plaintiff notified defendants in
writing of the problems with the s2000.  In addition, there is the issue of

whether plaintiff satisfactorily completed the required training course which would mean the six month and not the three month warranty was in effect.[6] There is also the issue of whether defendants ever certified completion of installation of the s2000, a necessary precondition for the warranty period to commence, and a fact not addressed by either plaintiff or defendants.

Additionally, viewing the facts in the light most favorable to plaintiff, the Court could find that the limitation of liability provision failed of its essential purpose since, according to plaintiff's allegations, the s2000 was never properly repaired. Finally, since the Court shall recommend that the fraudulent inducement claim not be dismissed at this juncture, plaintiff would have a chance of establishing that it was fraudulently induced into signing the p&s and that as such, the limitation of liability provision contained in the p&s is unenforceable. For all of the foregoing reasons, the Court shall recommend that

---

[6]

Plaintiff asserts that it did properly complete the training course and as support attaches a "Certificate of Completion". Defendants correctly point out that such certificate reflects that the training course was completed on September 1, 2000, at least two years *before* the events giving rise to this lawsuit even occurred. While the Court may consider the Certificate of Completion since it is appended to the complaint, the Court does not find that the certificate in and of itself is enough to recommend dismissal of plaintiff's negligent misrepresentation and breach of contract claims. If the plaintiff did not complete the training course, then a three month warranty period, not a six month period, applied. There are still disputes over whether plaintiff notified defendants of problems with the s2000 and even if plaintiff did not give defendants notice of the deficiencies with the equipment, this fact alone is not enough necessarily to bar plaintiff from bringing suit against defendants. Moreover, it is unclear whether defendants' position is that the warranty provision itself bars plaintiff's claims or that the warranty provision and the limitation of liability provision together bar the claims. In any event, even taking the warranty and limitation of liability provisions together, dismissal of plaintiff's claims at this juncture would be premature.

the motion to dismiss be denied as to the negligent misrepresentation claim.

## C.    Count III:  Breach of Contract

Defendants contend that Count III should be dismissed because: it fails to state a claim; it (like the fraud and negligent misrepresentation claims) was released in the agreement and is barred by the statute of limitation provision in the p&s; and it (like the negligent misrepresentation claim) is barred by the warranty and limitation of liability clauses in the p&s.

First, the Court must consider whether, taking the allegations in the complaint as true, it states a claim for breach of contract.  To state a breach of contract claim, a plaintiff must allege that "(1)  an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing and able to perform; (3) the defendant's breach has prevented them from performing; and (4)  the plaintiffs have suffered damage." *Singarella v. City of Boston*, 342 Mass. 385, 387, 173 N.E.2d 290, 291 (1961) (internal citations omitted).

The complaint alleges that an agreement–the p&s–was entered into by the parties and was supported by consideration (#15 ¶ 12); that plaintiff was ready, willing and able to perform by paying for the s2000, signing a financing lease and moving to larger quarters (#15 ¶¶ 12-14); that defendants' breach

prevented them from performing (#15 ¶¶ 14-18, 23); and that plaintiff has suffered damage (#15 ¶ 14, 24). Thus, viewing the allegations in the most favorable light, plaintiff adequately has stated a claim for breach of contract. *Compare Doyle* 103 F.3d at 194-195 (breach of contract claim dismissed where plaintiff failed to identify the terms of the contract, the parties' obligations under the contract, that the plaintiffs were ready to perform or that defendants' breach prevented their performance).

Defendants also move to dismiss the contract claim based on the statute of limitation clause in the p&s and the warranty and limitation of liability provisions in the p&s. For all of the same reasons discussed in the sections above, the Court shall recommend that the motion to dismiss be denied as to the breach of contract claim.

### V. *Recommendation*

For the reasons stated, I RECOMMEND that Defendants' Motion To Dismiss (#14) be ALLOWED only to the extent that all claims of misrepresentation other than that the s2000 was able digitally to print cards on 30ml plastic be DISMISSED for failure to comply with Rule 9(b), Fed. R. Civ. P. I FURTHER RECOMMEND that Defendants' Motion to Dismiss (#14) be otherwise DENIED.

## VI.  Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P., any party who objects to these recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.   The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review.   *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271, 275 (1 Cir., 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604-05 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*
ROBERT B. COLLINGS
United States Magistrate Judge

September 15, 2005.

27