# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ADVANCED CARD SYSTEMS, INC.    )
d/b/a SANDIA IMAGING,    )
    )
               Plaintiff,    )
       v.    )    Case No. 04 C 12295 NG
    )
HEWLETT-PACKARD COMPANY    )
and INDIGO AMERICA, INC.    )
    )
               Defendants.    )

## PLAINTIFF'S SECOND AMENDED COMPLAINT

NOW COMES Advanced Card Systems, Inc., d/b/a Sandia Imaging, a Texas corporation and complaining of Defendants Hewlett Packard Company, a Delaware corporation, and Indigo America, Inc., a Delaware corporation, states as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Advanced Card Systems, Inc. d/b/a Sandia Imaging ("Sandia") is a Texas corporation with its principal place of business in Arlington, Tarrant County, Texas.

2.    Defendant Hewlett Packard Company ("Hewlett Packard" or "HP") is a Delaware corporation doing business in Texas.

3.    Defendant Indigo America, Inc. ("Indigo") is a Delaware corporation related to HP and doing business in Texas. Both HP and Indigo manufacture, market, sell, distribute and service printing presses.

4.    This case was originally filed in the District Court of Tarrant County, Texas, 342nd Judicial District. On September 24, 2004, Defendants removed this case pursuant to 28

U.S.C. § 1446(b).  Thereafter, the case was transferred on motion of Defendants to the United States District Court for the District of Massachusetts.

## IV. FACTS COMMON TO ALL COUNTS

5.    Sandia is a printing and distribution company, specializing in plastic card printing since 1998.  It has historically utilized an offset press, and continues to do so for some of its production.

6.    In 2002, Sandia sought to increase its production capacity and began exploring the products of several manufacturers, including Defendants.  Sandia also began negotiating with manufacturers of offset presses, which had historically fulfilled Sandia's needs and would have fit in Sandia's existing facility.

7.    During the summer and fall of 2002, Defendants' agent and representative, Vince Pentella ("Pentella"), and Martin Quintana ("Quintana"), solicited Sandia's business.  At all times, Pentella and Quintana held themselves out as agents and representatives of HP and Indigo. They explained that Indigo was affiliated with HP, a leader in the field of printing and printing presses.  The two entities were indistinguishable in the agents' presentations.  Sandia reasonably and justifiably believed that both entities were responsible for the products being marketed.

8.    On November 22, 2002, Pentella produced plastic cards, identical in design and thickness to Sandia's products, and represented that the cards had been digitally printed by Defendants' Indigo s2000 printing press ("s2000.")  The agents' cards were 30mil in thickness, industry standard for credit cards, and the identical thickness as required by Sandia's market.  A photocopy of the cards tendered to Sandia during Indigo's solicitation is attached hereto as Exhibit A.

2

9.    On November 22, 2002, representations were also made by Defendants' agents that Sandia's costs associated with production of plastic cards would decrease using Indigo's digital press in lieu of the traditional offset press. Specifically, these representations were made in an in-person meeting at Sandia wherein Pentella and Quintana met with several Sandia's executives, specifically its Chairman, Philippe Orsetti ("Orsetti"), Chief Engineer, Loren Rapoport and Director of Marketing, Don Delman. Quintana asked for Sandia's current costs of production and production outputs and then inputted the figures into his laptop computer. Quintana then demonstrated on his laptop how Sandia's costs of production would be less than if it went with a traditional offset press and that Sandia's costs would amount to $.03 per card with the use of the s2000. However, in actuality the costs of production were at least double the amount Pentella and Quintana represented and were at least $.06 per card with the s2000.

10.    All of the foregoing promises and representations were false. The costs of production were at least double the amount represented by Pentella and Quintana. Pentella's and Quintana's representations, because of their expertise in the industry and in particular with the Indigo Digital Press, were affirmative statements of fact, not opinion. Upon their evaluation of Sandia's business and their knowledge of their product, representations that the costs of production would be $.03 per card were made without any reasonable basis and with knowledge of its falsity or in reckless disregard to the truth. These representations were material and were made to induce Sandia to purchase or lease the s2000, which Sandia would not have done had it known of the system's defects, lack of capabilities and actual costs of production.

11.    Sandia agreed to purchase the s2000 as a direct consequence of Defendants' representations to Sandia that the s2000 would provide: (1) excellent quality printing; (2) a lower production cost for finished products than Sandia's existing offset printing cost; (3) capabilities

3

for printing 30 mil plastic cards to fit Sandia's needs; and (4) a total investment for the complete system which was represented as equivalent to the purchase of an offset printing press.

12.     Defendants were informed, prior to the purchase, that in order to accommodate the s2000 and the accompanying lamination machine and punching machine, it would be necessary for Sandia to obtain a larger facility. Sandia did in fact obtain a larger facility, despite 20 months remaining on its existing lease. Sandia also had to build a contained humidity and temperature-controlled area within the new facility to accommodate the requirements of the s2000. All of the consequential expenses were known to Defendants. Plaintiff relied upon Defendants' representations and entered into a Purchase and Sales Agreement with Defendants on December 5, 2002, whereby Sandia agreed to purchase the s2000 for $334,000. A financing lease was signed with HP Financial Services on December 17, 2002. Copies of the Purchase and Sales Agreement and financing lease are attached hereto as Exhibits B and C.

13.     Consistent with the discussions between the parties prior to the purchase, Sandia contracted to lease a new, larger manufacturing facility on January 1, 2003. Sandia also acquired from other sources a laminating machine, a punch Press, and all necessary ancillary equipment for the s2000 process, but unnecessary for the offset printing Sandia had done in the past.

14.     The s2000 was delivered to and installed at Sandia's premises on or about March 15, 2003. Despite the numerous representations of Defendants, the s2000 was unable, when delivered, to process printing on 30 mil plastic as promised. Because the s2000 was unable to process the 30 mil cards, Sandia was forced to engage in an expensive experimental alternative process utilizing two sets of thinner substrate plastic. Sandia was caused to employ expensive and complicated modifications, increasing the cost of production beyond that projected by Defendants, such as the need for a tacking station to stabilize the multiple substratas. In

addition, Sandia found out from a list of Defendant-recommended suppliers of ancillary equipment and supplies, that the plastic sheets to be used for printing needed to be specially coated in order to receive the s2000 printing process, thus substantially increasing the cost of the substrate.

15.    Sandia made numerous complaints to Defendants about the defects in the system. Defendants responded with promises to correct the s2000 and retrofit the system with modifications to enable it to print on the 30mil cards. The modifications were first promised by February 2003. When they were not delivered, they were promised by April 2003 and then by May 2003. Despite the succession of promises, the modifications were never delivered. In fact, there were no modifications that Defendants had, or knew of, which would allow the s2000 to operate according to the Defendants' representations. The promises were made to induce Sandia not to cancel the Purchase Agreement.

16.    On August 25, 2003, Sandia's president, Pelletier, sent a letter to Defendant Indigo's national sales manager, Pentella, again setting forth the problems and defects Sandia was experiencing with the s2000. A copy of the August 25, 2003 letter is attached hereto as Exhibit D. However, just as in months past, Defendants failed to remedy the defects.

17.    Lease payments were scheduled to commence to HP Financial in August 2003. Because of the system's defects, and as part of Defendants' ongoing scheme to keep Sandia from canceling the contract and asserting a claim against Defendants, the lease commencement was postponed on a month-to-month basis to March 2004.

18.    By October 2003, the system was still defective and Sandia's financial losses had become critical. While Sandia contemplated its legal alternatives, Defendants proposed a letter agreement. The letter agreement was tendered with the understanding that Defendants would

promptly correct the defect and retrofit the system. Defendants never intended to retrofit the machine to process 30mil cards, but only had made these promises as part of Defendants' continuing scheme to prevent Sandia from canceling the contract and pursuing its claim against Defendants.

19.     In the letter agreement, the Defendants promised, *inter alia*: 1) to pay $13,000.00 to Sandia; 2) to commence a Shared Maintenance Service for twelve months, from October 2003 to October 2004, at no cost to Sandia; and 3) to provide a "Thick Substrates Kit", which HP professed it was developing and which the parties understood would process 30mil plastic card. The letter was proposed and prepared by Defendants and also contained a provision whereby Sandia would release Defendants from "any and all claims or damages." The letter also contained a condition subsequent by which Sandia could elect to void the agreement "*ab initio.*"

20.     Sandia signed Defendants letter agreement on November 7, 2003. It was signed by George Krikorian of Hewlett Packard, on behalf of Defendants. Defendants never supplied the retrofit or the Thick Substrates Kit that would process 30mil plastic cards. The system is still defective. Sandia elected to void the letter agreement and took those steps required by the agreement to exercise the condition subsequent.

## V. CAUSES OF ACTION

### FRAUD AND FRAUD IN THE INDUCEMENT

21.     The promises made by Defendants, as aforesaid, were material, false and made with knowledge of their falsity. They were made to induce Sandia to forego its rights to cancel the contract and seek damages from Defendants. The promises were part of an ongoing scheme to defraud Sandia. Although presented with physical specimens of 30mil cards, bearing the legend "digitally printed on an HP s2000 Indigo Press," Defendants knew such representations

were false and that the system could not perform without further modifications, which were undeveloped. Continuing representations, including the letter agreement, promised delivery of these modifications when there was no basis for such representations. Defendants intended for Sandia to rely on such representations, which Sandia reasonably did, and suffered damages proximately caused by such reliance.

## NEGLIGENT MISREPRESENTATION

22.    Alternatively, the promises made by Defendants, as aforesaid, were material, false and made in negligent or reckless disregard to their truth. They were made to induce Sandia to forego its rights to cancel the contract and seek damages from Defendants. The promises were part of an ongoing solicitation to mislead Sandia into believing that the s2000 would process Sandia's business. Although presented with physical specimens of 30mil cards, bearing the legend "digitally printed on an HP s2000 Indigo Press," Defendants negligently made such representations without confirming with the appropriate technology people within Defendants' companies as to whether the system could perform as promised without further modifications, or whether such developments were immediately forthcoming. Continuing representations, including the letter agreement, promised delivery of these modifications when there was no basis for such representations. Defendants intended for Sandia to rely on such representations, which Sandia did, and suffered damages proximately caused by such reliance.

## BREACH OF CONTRACT

23.    Additionally or alternatively, if necessary, the one or several contracts between the parties have been breached by the Defendants. Defendants HP and Indigo have failed to perform their obligations and deliver the system compatible with the express warranty that it conform to the samples and the implied warranty that it be fit for Sandia's particular purpose of

7

processing 30 mil cards. The delivery of the sample cards created an express warranty that the s2000 would produce cards that would conform to the sample. The sample cards became a part of the basis of the bargain and Defendants continuous promises to repair and modify the s2000 also became a basis of the bargain which created an express warranty that the s2000 would be capable of processing cards to conform to the thickness of the sample. It was a basic fundamental understanding of the parties that the Defendants would deliver a machine that would process 30 mil plastic cards. At the time of entering into the Purchase and Sales Agreement, Defendants clearly knew that Sandia's business consisted of producing 30 mil cards and that for its business purposes Sandia required a machine to process cards of that particular thickness. Defendants' knowledge and understanding of Sandia's business needs created an implied warranty of fitness for a particular purpose. Further, the Purchase and Sales Agreement provided for a remedy to repair or replace any defective part. The warranty provision of the agreement provided that the warranty period would be for 3 months commencing on the date of installation and extend to 6 months if Sandia contemporaneously signed a Shared Maintenance Agreement and completed a Shared Maintenance Training Course. Sandia executed a Shared Maintenance Agreement and one of its employees successfully completed the training course thereby extending the warranty period for 6 months to on or about September 15, 2003. A copy the certificate of completion of the training course is attached hereto as Exhibit E. Sandia continuously and in a timely manner complained to Defendants of the s2000's lack of conformity, in both oral and written communications, but Defendants failed to repair or modify the machine. Defendants' failures to modify and repair the system constitute material breaches of contract.

8

## VI. DAMAGES

24.    Sandia here sues to recover its actual damages in an amount in excess of $600,000

at the date of the filing of this Second Amended Complaint, exclusive of costs or interest.

25.    Sandia also sues to recover punitive damages, including attorneys' fees as a part

of punitive damages, in a reasonable sum.

### JURY DEMAND

26.    Plaintiff demands a trial by jury on all issues.

Respectfully submitted,

ADVANCED CARD SYSTEMS, INC.
d/b/a SANDIA IMAGING
by its attorneys,


 /s/ John T. Hugo
John T. Hugo, BBO #567262
Jennifer B. Furey, BBO #634174
COOLEY MANION JONES LLP
21 Custom House Street
Boston, MA 02110
(617) 737-3100

and

Ronald H. Balson
Carrie A. Hall
Hill, Gilstrap & Balson
303 West Madison Street, Suite 1050
Chicago, IL 60606
(312) 853-2920


DATED: November 23, 2005

151631v1

# EXHIBIT A

**Scans of one Gold Card given by
HP's representatives to Sandia Imag-
ing in 2002.**

"Digitally printed on an HP Indigo Press
s2000" mentioned on back.




**Scans of one Silver Card given by
HP's representatives to Sandia Imag-
ing in 2002**

"Digitally printed on an HP Indigo Press
s2000" mentioned on back.




# EXHIBIT B

## PURCHASE AND SALE AGREEMENT



**hp indigo press s2000 Six-Color**
**Seller: Indigo America, Inc., a wholly owned subsidiary of Hewlett-Packard Company (hereinafter referred to as "Seller")**

| | | | | |
|---|---|---|---|---|
| Buyer: Sandia Imaging | | Today's Date: 12/5/02 | | Expiration Date: 1/31/03 |
| Attn: Bertrand Pelletier | | | | |
| Street: 2811 Galleria Drive | | Requested Shipping Date (No Later Than): December 16, 2002 | | |
| City/State/Zip: Arlington, TX 76011 | | | | |
| (hereinafter referred to as "Buyer") | | Account Executive: R. Oomen | District Mgr: B. Shepherd | Branch Mgr: M. Daly |
| SHIP TO ADDRESS (IF DIFFERENT FROM ABOVE): | | | | |
| Attn: | | Buyer's Phone No.: 817-649-3222 | | |
| Street: | | | | |
| City/State/Zip: | | Buyer's Fax No.: 817-649-3301 | | |

| F. O. B. Point: Shipping Point |
|---|

| EQUIPMENT DESCRIPTION | PRICE |
|---|---|
| Newly Manufactured hp indigo press s2000 Six-Color including: <br> • One-Shot Color™ <br> • Pentium™ CPU with Windows NT <br> • 72 GB Virtual Image Memory (RAID) <br> • Internal hp indigo RIP (Adobe® PostScript 3) <br> • Electronic Collation <br> • Color Personalization <br> • Image Tracking Technology (ITT) <br> • 5th & 6th Color <br> • hp IndiChrome ink mixing system (excl PC) <br> • 2.2 GB ORB Archive Device <br> • In-Line Densitometer <br> • HDI | $329,000.00 |

| INDICATE "YES" OR "NO" FOR EACH ITEM BELOW | EQUIPMENT SYSTEM TOTAL | |
|---|---|---|
| | Newly Manufactured hp indigo press s2000 Six-Color as above | $329,000.00 |
| | Freight includes shipping direct to Buyer's facility. DOES NOT INCLUDE RIGGING | $5,000.00 |
| NO | hp production flow without Adobe RIP | $20,000.00 |
| NO | hp production flow with Adobe RIP | $35,000.00 |
| | TOTAL (in USD) | $334,000.00 |

**PAYMENT TERMS:** 10% with order; 80% prior to shipment; 10% upon certification by Seller of Completion of Installation
BY SIGNING BELOW, BUYER ACKNOWLEDGES THAT THIS AGREEMENT CANCELS, SUPERSEDES AND REPLACES ANY AND ALL PRIOR AGREEMENTS OR UNDERSTANDINGS, WRITTEN OR ORAL, WITH RESPECT TO THE PURCHASE AND/OR LICENSE OF THE EQUIPMENT (SEE PARAGRAPH 18 OF THE TERMS & CONDITIONS).

| BUYER*** | INDIGO AMERICA, INC., a wholly owned subsidiary of Hewlett-Packard Company |
|---|---|
| BY: | BY: |
| PRINT NAME: BERTRAND L. PELLETIER | PRINT NAME: Rick Mangold |
| TITLE: PRESIDENT & CEO | TITLE: General Manager |
| DATE: 12/5/02 | DATE: 4-30-03 |

***THIS PURCHASE AND SALE AGREEMENT IS SUBJECT TO ACCEPTANCE BY A DULY AUTHORIZED REPRESENTATIVE OF INDIGO AMERICA, INC, AND SHALL NOT BE CONSIDERED A CONTRACT UNTIL WRITTEN ACKNOWLEDGEMENT IS FURNISHED TO BUYER BY SELLER.

PURCHASE AND SALE AGREEMENT _____ Page 2

**WARRANTY**
Seller agrees to provide Buyer with a three (3) month warranty (the "Warranty Period") on the Equipment. In addition, Seller will provide Buyer with an additional three (3) months of warranty, thereby extending the Warranty Period to a total of six (6) months if Buyer (i) contemporaneously with the execution of this Purchase and Sale Agreement, executes a one (1) year agreement for Seller's Shared Maintenance on the Equipment and (ii) completes the required Shared Maintenance Training Course within six (6) months of Seller's completion of installation of the Equipment. In either event, the Warranty Period shall be deemed to have commenced upon Seller's certification of completion of installation of the Equipment.

**BASIC OPERATOR TRAINING**
For the Equipment described on the face-page of this Agreement, Seller provides, at no cost to Buyer, up to fourteen (14) days (the "Training Period") of press and pre-press training ("Basic Operator Training") at one of Seller's designated Training Centers for two (2) of Buyer's qualified operators.

Buyer shall be responsible for all travel arrangements, food, lodging, compensation and other related expenses for Buyer's employees during the Training Period.

Buyer shall have six (6) months from the date of Seller's certification of completion of installation of the Equipment, to complete the training described above. In the event Buyer fails to complete the Basic Operator Training within such time period, Buyer shall be deemed to have waived its rights to receive, at no cost, the Basic Operator Training described herein.

All training services provided by Seller, in addition to the Basic Operator Training, such as retraining or training of an additional operator, shall be billed to Buyer at the then current applicable rate.

**LEASE FINANCING** ☒YES ☐NO
**IF YES, BUYER'S INITIALS REQUIRED:** _____
Buyer intends to seek third party financing for the purchase of the Seller Equipment described this Agreement. At Buyer's request, Seller will assist Buyer in obtaining third party lease financing. If Buyer is unable to qualify for financing, upon terms and conditions acceptable to Buyer in Buyer's sole discretion, Buyer shall have the right to rescind this Agreement upon written notification to Seller, provided, however, that such notification must be provided to, and received by, Seller prior to shipment of the Equipment by Seller to Buyer. In the event of such rescission, Seller will refund Buyer's deposit in its entirety.

**STATE SALES/USE TAX**
Is Buyer exempt from State Sales/Use Tax?    ☒YES ☐NO
**IF YES, PLEASE ATTACH A COPY OF EXEMPTION CERTIFICATE.**

**ACCOUNTS RECEIVABLE CREDIT**
Upon Seller's Certification of Installation of the Equipment described herein, and receipt of all payments due hereunder from Buyer, Seller will provide Buyer with a credit in the amount of Nineteen Thousand Two Hundred Eighty and 00/100 dollars ($19,280.00 USD) to be applied to Buyer's Imaging Product Account Receivable Balance with Seller.

**FINAL AGREEMENT**
Buyer specifically acknowledges and agrees that the provisions of this Purchase and Sale Agreement represent the entire agreement between Buyer and Seller with respect to the purchase of the Equipment, and that this Agreement supersedes and cancels any and all prior understandings, written or oral between the parties, including, but not limited to, that certain Purchase and Sale Agreement dated December 2, 2002.

Buyer's Initials: _____    Date: _____

Indigo America, Inc. _____    Date: _____

*Revised October 2002 by tje*

PURCHASE AND SALE AGREEMENT    TERMS AND CONDITIONS OF SALE    Page 3

**1. EQUIPMENT DEFINITION.** The term "Equipment," wherever used in this Agreement shall mean all of the equipment and/or software described on page 1 and purchased or licensed by Buyer under this Purchase and Sale Agreement. Equipment described as "Newly Manufactured" has been factory produced to product operating specifications, and contains not less than ninety percent (90%) brand new parts, with the remaining parts comprised of remanufactured, reprocessed or reconditioned parts that have been disassembled and reassembled in accordance with Seller's highest standards. Equipment described as "Previously Operated" has been previously operated and, unless a Warranty Period is stated on Page 2 of this Agreement, is provided to Buyer "AS IS/WHERE IS".

**2. ACCEPTANCE.** Acceptance of the Buyer's Purchase and Sale Agreement, hereinafter referred to as the "Agreement," is expressly limited to the terms and conditions set forth herein and in the attachments, if any, hereto, which, upon the express written acceptance by Seller, shall constitute the complete agreement between the parties. This Agreement is a firm Agreement and shall not be withdrawn by the Buyer for want or lack of consideration, nor shall the Buyer attempt to amend this Agreement without the express written approval of Seller. Any additional or different provisions to this Agreement shall be deemed material and are hereby objected to and rejected.

**3. PRICES.** If there is a delay in completion of shipment of the Equipment purchased under this Agreement, due to any change requested by Buyer or any delay on Buyer's part in furnishing information required for completion of this Agreement, the price agreed upon at the time of acceptance of this Agreement by Seller is subject to change. Prices are FOB shipping point and are exclusive of all taxes - federal, state, or local - which shall be paid by Buyer, either directly or through Seller. If such taxes are not included in an invoice for the Equipment, they may be invoiced separately later.

**4. TERMS OF PAYMENT.** Unless otherwise stated on the face page hereof, all payments shall be made by bank wire funds transfer to Seller's bank account as directed by Seller in writing, or other reasonable payment method acceptable to Seller, in accordance with the payment terms set forth on the face page hereof, without abatement, set-off or deduction of any amount whatsoever and despite any defense or counterclaim Buyer may have against Seller. A finance charge of 1.5% per month will be added to, and will be payable by Buyer in respect of, all invoices not paid in accordance with the aforesaid payment terms.

**5. TITLE; RISK OF LOSS; INSURANCE.**

(a) Buyer shall take title to, and shall accept the Equipment, upon delivery to Buyer's site. Buyer grants Seller a Purchase Money Security interest in any product that has not yet been fully paid for, and further agrees to execute any documents required by Seller to perfect this security interest.

(b) Delivery shall occur, and risk of loss shall pass to Buyer, upon delivery of the Equipment to Buyer's site.

(c) Seller shall arrange for the shipment of the Equipment to Buyer and shall charge Buyer for such shipment as set forth on the face page hereof.

(d) As of the date of arrival of the Equipment at Buyer's premises, and until such time as full payment for such Equipment has been effected by Buyer, Buyer shall obtain and maintain insurance with respect to the Equipment, naming Seller as loss payee, to such extent and against such risks, hazards, and liabilities as is currently maintained by

companies similarly situated (provided, however, that in no event shall the amount of insurance required to be maintained against damage to or loss of the Equipment be less than any balance owed to Seller with respect to the Equipment).

**6. TIMETABLE AND FORCE MAJEURE.**

(a) Any delivery time and/or installation date appearing on the face hereof, or in any other document furnished by Seller, will be deemed an approximation only. The approximate delivery time/s will begin to run on the date of Seller's acknowledgment of Buyer's purchase hereunder and receipt of all specifications; except that, in the case of special items considered non-standard by Seller, such delivery time/s will begin to run on the date on which Seller receives complete information necessary to design and manufacture the relevant Equipment.

(b) All estimated shipping and installation dates are subject to delays caused by Buyer as well as civil insurrection, war, fire, strike, labor stoppage, act of God, shortage of fuel, energy or materials, the failure of suppliers or subcontractors to satisfactorily meet scheduled deliveries, the establishment of any priority systems by the United States government or any of its agencies, or any other factor or cause beyond Seller's or Seller's affiliated company's reasonable control. None of the above-described factors or causes shall give rise to any liability on Seller's part whatsoever, including without limitation loss of use or profits as well as any indirect, incidental, or consequential damages. If any of the aforementioned contingencies occurs, Seller may allocate production, delivery, and installation among its customers and may adjust delivery and installation schedules as it deems necessary in its reasonable discretion.

**7. INSTALLATION AND OPERATIONAL CHECKS.** Seller's technical personnel shall install the Equipment at Buyer's site. In connection with the installation, Buyer shall ensure that its site for the installation of the Equipment and Software is in full compliance with Seller's then current site preparation specifications, a copy of which shall be furnished by Seller prior to the Anticipated Delivery Date.

(a) Prior to installation, Buyer shall not handle, attempt to operate, or operate any Equipment except in the presence and under the supervision of authorized Seller technical personnel, and shall prevent any third party from doing so. Following installation, Buyer will cause the Equipment to be operated only by competent and properly trained operators in accordance with the standard operator's manual furnished by Seller.

(b) Upon installation of the Equipment, Seller's technical personnel shall conduct, in accordance with Seller's then current operational check procedures, a series of operational checks thereon. Seller's personnel will confirm successful completion of the operational checks by signing and furnishing to Buyer, upon Buyer's request, a Certificate of Completion of Installation in respect of the Equipment.

(c) Post Installation: After installation of the Equipment in accordance with Seller's direction, Buyer will not modify any Software or hardware configuration and/or connection(s) of the Equipment, without prior notification to and express written permission from Seller. Any modification of the installed configuration and/or connection(s), without Seller's express written consent, will void all applicable Software license agreements.

**8. WARRANTIES; LIMITATION OF LIABILITY.**

(a) Seller warrants, for the Warranty Period described in this Agreement, each item of Equipment against defects arising from Seller's faulty materials and workmanship, provided that (1) Seller

Buyer's Initials: _____    Date: 12/5/02

Indigo America, Inc. _____    Date: 4/30/03

*Revised October 2002 by tjc*

PURCHASE AND SALE AGREEMENT        TERMS AND CONDITIONS OF SALE        Page 4

has received, prior to the end of Warranty Period specified herein, written notice regarding a defective part of an item of Equipment, (2) Buyer has afforded Seller prompt and reasonable opportunity to inspect any part as to which any claim is being made, and (3) the relevant part has been stored, shipped, handled, installed, operated, and maintained in accordance with the then current recommendations set forth in Seller's manual and/or other written instructions and has not been modified without Seller's prior written approval

(b)  Should Seller determine, in its reasonable discretion, after its timely receipt of notice in the manner specified above, that any part of an item of Equipment is defective due to Seller's faulty materials or workmanship, Seller shall, at its expense, repair or replace (at Seller's sole option) such part and return the repaired/replacement part to Buyer.  The provisions of this Warranty shall apply to the repaired/replacement part for the unexpired portion, if any, of the Warranty Period.

(c)  In the event no Warranty Period is set forth on page 2 of this Agreement, then the Equipment described in this Agreement is provided to Buyer "AS IS/WHERE IS."

(d)  THE FOREGOING WARRANTY, SET FORTH IN THIS SECTION IS SELLER'S SOLE AND EXCLUSIVE WARRANTY REGARDING THE EQUIPMENT, AND THERE ARE NO OTHER WARRANTIES (INCLUDING, WITHOUT LIMITATION, WARRANTIES FOR CONSUMABLES AND OTHER SUPPLIES), LIABILITIES OR GUARANTEES, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE).  BUYER, EXCEPT AS AFORESAID, SHALL HAVE NO CLAIM AGAINST SELLER OF ANY NATURE WHATSOEVER, WHETHER ARISING IN CONTRACT, TORT, NEGLIGENCE OR ANY DEGREE, STRICT LIABILITY OR OTHERWISE, WITH RESPECT TO THE EQUIPMENT OR ANY PART THEREOF DELIVERED HEREUNDER AND/OR WITH RESPECT TO ANY NON-CONFORMANCE OR DEFECT IN ANY SUCH EQUIPMENT AND/OR PART THEREOF DELIVERED HEREUNDER, INCLUDING BUT NOT LIMITED TO ANY LIABILITY OF SELLER FOR ANY CONSEQUENTIAL AND/OR INCIDENTAL DAMAGES AND/OR LOSSES (INCLUDING, WITHOUT LIMITATION, LOSS OF USE, REVENUE, AND/OR PROFITS), AND IN ANY EVENT, THE EXTENT OF SELLER'S MAXIMUM LIABILITY TO BUYER HEREUNDER SHALL NOT, UNDER ANY CIRCUMSTANCES, EXCEED THE COST OF REPAIRING OR REPLACING (AT SELLER'S SOLE OPTION) ANY PART/S FOUND TO BE DEFECTIVE WITHIN THE WARRANTY PERIOD AS AFORESAID.

(e)  Without derogating from the above, if Seller, for any reason whatsoever, fails to perform, meet and/or fulfill, in respect of any item/s of Equipment, its obligations hereunder, and is unable to remedy such failure, then Seller's maximum aggregate liability (inclusive of any refund and/or remedy) for any losses or other damages incurred by Buyer and/or its customers (including, without limitation, consequential and/or incidental damages as well as loss of use and/or profits) shall not exceed the total amount paid by Buyer for such item(s) of Equipment.

9.  PATENT,  TRADEMARK,  AND  COPYRIGHT INFRINGEMENT CLAIMS.

(a)  Seller will defend, at its own expense, any action brought against Buyer to the extent that such action is based on a claim that the Equipment purchased and/or licensed from Seller hereunder infringes a patent, trademark, and/or copyright of the United States only, and Seller will pay those costs and damages finally awarded

against Buyer in any such action which are attributable to any such claim.

(b)  Such defense and payment are conditioned, however, on the following: (1) Seller will be notified promptly in writing by Buyer of any notice of such claim, (2) Seller will have sole control of the defense in any action on such claim and of all negotiations for its settlement or compromise and (3) should Seller's Equipment become, or in Seller's opinion be likely to become, the subject of a claim of infringement of any patent, trademark, and/or copyright, Seller will be entitled, at its sole option, to replace such Equipment, or to modify the same so that it becomes non-infringing, or to secure from the patent, trademark, or copyright holder (as the case may be) the right of unrestricted use of such patent, trademark, or copyright, or of the relevant Equipment, or to grant Buyer a credit for such Equipment (as depreciated) and accept its return.

(c)  Buyer will indemnify and hold Seller (and/or Seller's parent or affiliated entities as the case may be) harmless from and against any claim of patent, trademark, and/or copyright infringement: (1) relating to the use or sale by Buyer of any of Seller's Equipment in any combination, method, process, or programming application and/or (2) arising out of compliance by Seller with modification specifications furnished by Buyer.  In the event that any such claim is asserted against Seller, it will promptly notify Buyer of the assertion thereof and will permit Buyer to assume control of the litigation.

(d)  Each party shall cooperate with the other and furnish all aid, information and assistance necessary to defend any such claim of infringement.

(e)  Without derogating from the above, if Seller, for any reason whatsoever, fails to perform, meet and/or fulfill, in respect of any item/s of Equipment, its obligations hereunder, and is unable to remedy such failure, then Seller's maximum aggregate liability (inclusive of any refund and/or remedy) for any indemnification and/or losses or other damages incurred by Buyer and/or its customers (including, without limitation, consequential and/or incidental damages as well as loss of use and/or profits) shall not exceed the total amount paid by Buyer for such item(s) of Equipment.

(f)  UNDER NO CIRCUMSTANCES SHALL BUYER HAVE A RIGHT TO RESCIND THIS AGREEMENT OR ITS PURCHASE OF THE EQUIPMENT IN CONNECTION WITH A CLAIM OF INFRINGEMENT AGAINST BUYER OR SELLER.  THE FOREGOING STATES THE ENTIRE LIABILITY OF SELLER WITH RESPECT TO INFRINGEMENT OF PATENTS, TRADEMARKS, AND COPYRIGHTS BY SELLER'S EQUIPMENT OR ANY PARTS THEREOF.

10. SOFTWARE LICENSE.  License Grant. Software that accompanies the Equipment or is identified as part of the Equipment may include Proprietary Components and/or Open Source Components that may each be subject to the license terms defined herein, and/or to separate, complementary or supplemental license terms that add to or modify the terms herein (collectively, "License Terms").  Proprietary Components and Open Source Components are referred to, collectively, as "Software"  Proprietary Components are provided to Buyer (licensee) in binary form only.  Open Source Components are provided or made available to Buyer (licensee) in binary and/or possibly source code form. All Proprietary Components and any part thereof, (including, without limitation, documentation and any subsequent updates provided to Buyer by Seller, is licensed for use in binary form only on the single Indigo Equipment System on which the same is first installed. HP grants Buyer a license to Use one copy of the Proprietary Component(s) in the form that it is delivered to Buyer  The Software may be delivered in the respective form preloaded on a device, loaded on a CD, Internet download or other method of distribution  "Use" means storing, loading, installing, executing or displaying the Software  Buyer may not

Buyer's Initials: _____   Date: 12/5/02

Indigo America, Inc. _____   Date: 4/30/03

*Revised October 2003 by tje*

PURCHASE AND SALE AGREEMENT    TERMS AND CONDITIONS OF SALE    Page 5

modify, deconstruct, replicate, decompile, decompile, disassemble, reverse engineer or disable any licensing or control features of the Proprietary Component(s). If the Proprietary Component(s) is licensed for "concurrent use", Buyer may not allow more than the maximum number of authorized users to Use the Proprietary Component(s) concurrently.

The following additional provisions will apply in respect of the Software:

    a) Software is owned and copyrighted by Seller, its parent or affiliated companies and/or its third party suppliers. Neither this Agreement nor this license grant confers any title to, or ownership in, the Software and is not a sale of any rights in the Software Seller's third party suppliers may protect their rights in the event of any violation of these License Terms.

    b) Buyer shall not make available the Proprietary Component(s), in any form, to any third party except Buyer's employees or agents directly concerned with Buyer's licensed use of the Software.

    c) Transfer. Buyer's license at least to the Proprietary Components will automatically terminate upon any transfer of the Proprietary Component(s) Upon transfer, you must deliver the Software, including any copies and related documentation, to the transferee. The transferee must accept these License Terms as a condition to the transfer.

    d) Seller may terminate your license at least to the Proprietary Components upon notice for failure to comply with any of these License Terms. Upon termination, Buyer must immediately return at least the Proprietary Components of the Software, together with all copies, adaptations and merged portions in any form.

    e) Any license terms that may be associated with any Open Source Components are applicable to and govern the respective Open Source Components as stated therein. Copies of such license terms are provided or made available to Buyer (licensee) as directed by such respective license agreement(s).

Without derogating from the above, Buyer hereby acknowledges that USA export restrictions as well as certain licensor's terms and conditions (e.g. those of Sun Microsystems, Inc. and Adobe Systems, Inc., where applicable) shall govern Buyer's use of a portion of the hardware and software comprising the Equipment sold or licensed hereunder.

11. TECHNICAL ADVICE AND ASSISTANCE. Seller's warranty shall not be enlarged, and no obligation or liability shall arise, as a result of Seller's rendering of technical advice, facilities or services in connection with Buyer's order for the Equipment furnished. Although any technical advice furnished, or recommendation made, by Seller or any representative of Seller concerning any use or application of any product is believed to be reliable, Seller makes no warranty, expressed or implied, of results to be obtained. Buyer assumes all responsibility for loss, damage, and/or personal injury resulting from the use of any such advice.

12. DISPUTES. The parties' agreement in respect of the Equipment shall be deemed to be entered into in Massachusetts and to be a Massachusetts contract and shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts. Seller and Buyer specifically agree that any legal action brought relating to Equipment, consumables and/or supplies purchased or relating to the parties' agreement in respect thereof will be commenced in Massachusetts within one (1) year after the relevant claim arises, failing which such claim shall be barred notwithstanding any longer statutory period of limitations. All objections to venue are

hereby waived by both parties, and Buyer consents to service of process by certified mail addressed to the same address as that address designated for delivery of the Equipment purchased hereunder.

13. WAIVER. The failure of either party hereto, at any time, to require performance by the other party of any of its obligations hereunder shall in no way affect the full right to require such performance at any time thereafter. The waiver by either party hereto of any remedy with respect to a breach of any provision hereof shall not be taken as a waiver of a remedy with respect to any succeeding breach of such provision or any breach of any other provision.

14. SEVERABILITY. The parties agree that each provision contained in these Terms and Conditions of Sale shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. Moreover, if one or more of the provisions contained in these Terms and Conditions of Sale shall, for any reason, be held to be unenforceable, such provision or provisions shall be construed by the appropriate judicial body by limiting and reducing it or them, so as to be enforceable to the extent compatible with the applicable law.

15. CANCELLATION. Once accepted by Seller, this Agreement is not cancelable, in whole or in part, unless such cancellation is mutually agreed to in writing by both parties.

16. ASSIGNMENT. Seller may assign its obligations hereunder to Seller's parent or any subsidiary or other affiliated corporation or entity. Buyer shall not have the right to assign or transfer any of its rights or obligations under the agreement to any third party, without the prior written consent of Seller.

17. NO RESALE. Buyer is acquiring the Equipment for its own use and not for the purpose of resale, lease or other disposition.

18. INTEGRATION; MODIFICATION. The provisions hereof, including all attachments hereto, if any, represent the entire agreement between the parties with respect to the purchase and/or licensing of the Equipment, and cancel all prior understanding, written or oral. No amendment, waiver, or cancellation of any part of the Agreement shall be valid unless in writing and signed by an authorized representative of both parties

19. PURCHASE ORDER. If a purchase order is issued by Buyer, or by any third party on behalf of Buyer, in connection with the purchase of the Equipment, none of the terms and conditions contained in such Purchase Order shall modify or supercede the terms and conditions of this Purchase and Sale Agreement Seller's failure to object to terms contained in any such Purchase Order, or other communication from or on behalf of Buyer, shall not be a waiver of the terms set forth in this provision or in this Agreement.

20. HEADINGS. All headings or captions used herein are for convenience of reference only and shall not limit or define these terms and conditions.

21. CONFIDENTIAL AND PROPRIETARY INFORMATION. Any information, correspondence, drawings, manuals and other documents transmitted or communicated by Seller or the Manufacturer to Buyer and marked "confidential" or "proprietary," or which Buyer has reason to believe is such, shall be received and treated by Buyer in secrecy and confidence, and shall not be used by Buyer for any purpose except the purpose stated herein or otherwise authorized in writing by Seller, or disclosed by Buyer to any person or firm without the prior express written consent of Seller. Such confidential and proprietary information may be disseminated within Buyer's own organization only to the extent reasonably required for the proper operation of the System

Buyer's Initials: _____    Date: 12/5/02

Indigo America, Inc. _____    Date: 4/30/03

*Revised October 2002 by tje*

# EXHIBIT C

Schedule A to Business Lease Agreement

  hp financial services

Lease Number: 102121

| Lessee: ADVANCED CARD SYSTEMS, INC. D/B/A SANDIA IMAGING |
|---|

| Equipment Description: | Qty.: | Type: | Unit Cost: | Total Amt.: |
|---|---|---|---|---|
| Please see attached Exhibit A | 1 | | $334,000.00 | $334,000.00 |

| Equipment Location: Please see attached Exhibit A | | |
|---|---|---|
| Street Address: 2811 Galleria Drive | | |
| City: Arlington | County: | State: TX Zip: 76011 |
| Area Code/Phone No.: | | Area Code/Fax No.:N/A |

| Vendor Information: Hewlett-Packard | | |
|---|---|---|
| Street Address: Please see attached Exhibit A | | |
| City: | County: | State:    Zip: |
| Area Code/Phone No.: | | Area Code/Fax No: |

1.  **Initial Term:** 60 Months (6 MONTHS DEFERRED- 54 PAYMENTS) (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month in which the Acceptance Date occurs).

2.  **Lease Payments: $7,211.06 payable monthly, in advance.** You agree to pay us on the first day of each calendar month, the Lease payment specified in this Paragraph 2 for the length of the Initial Term of this Lease. The First Payment Date will be the first day of the month immediately following the month in which the Acceptance Date occurs.

3.  **Lessee's End of Term Options:** You may choose to exercise one of the following options upon the natural expiration of the Initial Term and any Renewal Term (as defined below) and any automatic extension of the Initial Term or any Renewal Term; provided, however, that you must give us written notice of your choice ("End-of-Term Notice") not less than ninety (90) days before expiration of the relevant term:

    (a) **Purchase Option.** Provided no Lessee Default has occurred and is continuing, you may purchase the Equipment at its then Fair Market Value (plus all applicable sales taxes) on an "all or none" and "as-is, where-is" basis, without any representations or warranties, including no warranties of merchantability or fitness, other than the absence of any liens or claims by or through Lessor. "Fair Market Value" means the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell; provided, however, that in such determination: (i) the Equipment will be assumed to be in the condition in which it is required to be maintained and returned under this Lease, (ii) in the case of any installed Equipment, that Equipment shall be valued on an installed basis, and (iii) costs of removal from the current location shall not be a deduction from such valuation. If you and we are unable to agree on the Fair Market Value of the Equipment at least thirty (30) days before the Lease expiration, we will appoint an independent appraiser to determine the Fair Market Value and such appraiser's determination will be final, binding and conclusive. You will bear all costs associated with such appraisal.

    (b) **Lease Renewal Option.** Provided no Lessee Default has occurred and is continuing, you may renew the Lease at the then Fair Rental Value. "Fair Rental Value" means the amount of periodic rent that would be payable for the Equipment in an arm's length transaction between an informed and willing lessee and an informed and willing lessor, neither under compulsion to lease. Such amount will not be reduced by the costs of removing any Equipment from its current location or moving it to a new location. In the event of such an election, you will enter into a mutually agreeable renewal agreement with us ("Renewal Agreement") on or before the last day of the then applicable term of the Lease confirming the period for which the Agreement is to be renewed (the "Renewal Term"), and the amount of Rent and the times at which such Rent is to be payable during the Renewal Term.

    (c) **Equipment Return Option.** On or before the last day of the Initial Term or any Renewal Term (and any other time you are required to return Equipment to us under the terms of this Lease), you shall, at your own risk and expense, pack the Equipment to be returned to us in accordance with the manufacturer's guidelines and deliver such Equipment to us at any destination within the continental United States designated by us. All dismantling, packaging, transportation, in-transit insurance and shipping charges shall be borne by you. All Equipment shall be returned to us in the same condition and working order as when delivered to you, reasonable wear and tear excepted. You shall be responsible for, and shall reimburse us promptly on demand for, the cost of returning the Equipment to good working condition.

    (d) **Automatic Extension.** If you fail to deliver an End-of-Term Notice to us at least 90 days prior to the expiration of the Initial Term or any Renewal Term in which you elect to purchase the Equipment in accordance with Section 3(a) above, renew the term of the Lease in accordance with Section 3(b) above, or return the Equipment to us in accordance with Section 3(c) above, then the Initial Term or the applicable Renewal Term will, without any additional notice or documentation, be automatically extended for successive calendar months through the end of the calendar month falling at least 90 days after the date you shall have delivered to us an End-of-Term Notice. For each calendar month that the then applicable term of the Lease is so extended, you shall pay us the monthly Rent payment in effect immediately prior to

Rev 06/2000

such extension (or the appropriate pro rata portion of the Rent payment then in effect in the case of Rent payable other than on a monthly basis), and all other provisions of the Lease and this Schedule shall continue to apply.

If you deliver an End-of-Term Notice to us but subsequently fail to comply with your obligations arising from your election specified in that notice (e.g., you fail, on or before the last day of the then applicable term (i) to pay us the purchase price for the Equipment to be purchased in accordance with Section 3(a) above, (ii) to execute a Renewal Agreement with respect to the Equipment if the Lease is to be renewed in accordance with Section 3(b) above, or (iii) to return to us the Equipment to be returned in accordance with Section 3(c) above), then the applicable term of the Lease will, without any additional notice or documentation, be automatically extended as described in Section 3(d) above.  Notwithstanding any of the provisions of this Section 3 to the contrary, if any Lessee Default has occurred and is continuing at any time during the last 90 days of the then applicable term of the Lease, we may cancel any Renewal Term or automatic extension of the then applicable term immediately upon written notice to you.

**4.    PRICING EXPIRATION DATE: 12/31/2002.**  Our obligation to purchase and lease the Equipment is subject to the Acceptance Date being on or before the Pricing Expiration Date.


WE AGREE TO LEASE TO YOU AND YOU AGREE TO LEASE FROM US THE EQUIPMENT DESCRIBED IN THIS SCHEDULE A UNDER THE TERMS AND CONDITIONS SET FORTH IN THIS SCHEDULE A AND THE LEASE.

| LESSEE: | LESSOR: |
|---|---|
| ADVANCED CARD SYSTEMS, INC, D/B/A SANDIA IMAGING | HEWLETT- PACKARD FINANCIAL SERVICES COMPANY |

BY: _____        BY: _____

BENJAMIN L. PELLETIER, PRESIDENT

Name and Title                                                Name and Title

2/17/2002

Date                                                                 Date

Rev 06/2002



hp financial services

420 MOUNTAIN AVENUE, P.O. BOX 6
MURRAY HILL, NJ 07974-0006

## Business Lease Agreement

| Lessee: ADVANCED CARD SYSTEMS, INC. D/B/A SANDIA IMAGING | | | Lease Number: 102121 |
|---|---|---|---|
| Billing Address: 2811 Galleria Drive | | Tax ID Number: 75-2763081 | |
| City: Arlington | County: State: TX | Zip: 76011 | |
| Area Code/Phone 817-649-3222 | | Area Code/Fax No. 817-649-3301 | |

This Business Lease Agreement (including the attached Schedule A, this "Lease") refers throughout to the undersigned Lessee as "you" or "your" and to the undersigned Lessor as "we", "us" or "our". In consideration of our purchase of the hardware equipment, related peripherals and software described on Schedule A (the "Equipment"), you hereby lease the Equipment from us for your business purposes only (and not for personal, family or household purposes), subject to all terms and conditions of this Lease. You acknowledge that you selected the vendor as identified in Schedule A (the "Vendor") and all such Equipment without our assistance. You agree that this Lease is a net lease so you will pay, by Rent payment increase or upon our demand, all costs connected with the Lease and the Equipment, such as taxes (e.g., property, sales and use taxes), insurance, repairs, maintenance, shipping, filing fees, collection costs, bad check charges, and reasonable attorneys' fees. The initial term of this Lease will begin on the Acceptance Date of the Equipment and will continue for the period described in Schedule A (the "Initial Term"). If you do not elect to either purchase the Equipment, renew this Lease or return the Equipment by the end of the Initial Term or the Renewal Term in accordance with the terms of Schedule A hereto, or you fail to comply with your obligations arising from the election, you will continue to pay the original Rent payments for any full or partial month that you keep the Equipment. If you have selected either a Fair Market Value or a 10% End of Term Purchase Option (as indicated on Schedule A), then we and you intend this Lease to be a "Finance Lease" as defined in Article 2A of the Uniform Commercial Code (as enacted and in effect in any applicable jurisdiction, the "UCC") and you authorize us to file a UCC financing statement to give public notice of our ownership of the Equipment. If you have selected a $1.00 End of Term Purchase Option or if this Lease is otherwise deemed to be a "lease intended for security", then to secure payment and performance of your obligations under this Lease, you hereby grant us a purchase money security interest in the Equipment and in all attachments, accessories, additions, products, replacements, and proceeds (including insurance proceeds) to and of the Equipment, as well as a security interest in any other equipment we have leased to or financed for you, and you authorize us to file a UCC financing statement to perfect such security interest. You authorize us to modify Schedule A to reflect any Rent payment adjustment provided for above and to complete or modify any Equipment description in Schedule A or any related document to accurately describe the Equipment actually accepted by you.
EXCEPT AS TO QUIET ENJOYMENT, WE MAKE ABSOLUTELY NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING NO WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE. You can only make any claim relating to the Equipment against the Vendor or manufacturer, and you waive any such claim against us. We hereby assign any Equipment warranties during the Initial Term or Renewal Term for your exercise at your expense. WE WILL NOT BE LIABLE FOR SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES. YOU AGREE THAT YOU HAVE AN ABSOLUTE AND UNCONDITIONAL OBLIGATION TO PAY ALL RENT PAYMENTS AND OTHER AMOUNTS WHEN DUE. YOU ARE NOT ENTITLED TO ABATE OR REDUCE RENT OR ANY OTHER AMOUNT DUE, OR TO SET OFF ANY CHARGE AGAINST ANY SUCH AMOUNT FOR ANY CAUSE AND REGARDLESS OF ANY PROBLEMS WITH THE EQUIPMENT, VENDOR, OR US AND YOU WAIVE ANY RECOUPMENT, CLAIM OR DEFENSE TO ANY LEASE PAYMENT.
You agree to indemnify, defend and hold us harmless against any and all claims, obligations, actions, suits, proceedings, losses, damages, or liabilities, including attorneys' fees and court costs, arising directly or indirectly out of this Lease or the Equipment, including, but not limited to, the manufacture, purchase, ownership, leasing, defect, condition, use, maintenance or operation, and whether arising out of breach of contract, tort, or strict or product liability. You agree not to move the Equipment or to transfer, sell, sublease, or encumber either the Equipment or any rights under this Lease without our prior written consent. You shall give us at least thirty (30) days prior written notice of any such permitted transfer, sublease, or assignment of this Lease or any Equipment. We may freely assign our rights and interests under this Lease or in the Equipment without notice to you or your consent. You agree that our assignee will

have the same rights and remedies as we do and that our assignee's rights will not be subject to any claims you may have against us.
We own the Equipment and, unless you have selected a $1.00 End of Term Purchase Option, we retain all benefits of ownership and you agree not to take any position inconsistent with our ownership. We may inspect the Equipment and attach Equipment ownership labels. You are solely responsible for the installation, operation, and maintenance of the Equipment, will keep it in good condition, will use it in compliance with applicable law, and will not attach it to building fixtures. You bear all risk of loss or damage to or from the Equipment from any cause whatsoever until the Equipment is returned to and received by us. You shall promptly notify us of any loss or damage to the Equipment. Upon the occurrence of any loss or damage to the Equipment, you agree to immediately pay us the present value (discounted at 6% per annum, compounded monthly) of all payments payable under this Lease plus the then Fair Market Value of the Equipment as determined by us. You shall obtain and maintain, at your expense: 1) commercial general liability insurance covering bodily injury and property damage, and 2) all risk property insurance against loss or damage to the Equipment, including, without limitation, loss by fire (including extended coverage), theft and such other risks of loss as are required on the type of Equipment leased hereunder. The all risk property insurance coverage for loss or damage to the Equipment shall be, at a minimum, the amount of the replacement value of the Equipment, and the general liability insurance shall be in an amount not less than $2,000,000 total liability per occurrence. The commercial general liability policy shall name us as additional insured, and the all risk property damage insurance policy will name you as insured and us as loss payee, as our interests may appear. Upon our request, you shall furnish to us a certificate of insurance as evidence of insurance coverages. Such certificates of insurance shall state that we shall be provided with at least 30 days prior written notice of cancellation or material change to the insurance coverages, and each policy of insurance shall contain deductibles in amounts reasonably acceptable to us with regards to our credit evaluation of the you, the type and Total Cost of the Equipment and the related transaction amount.
Any of the following will constitute a default by you (a "Default") under this Lease: (a) you fail to pay any Rent payment or any other amount payable to us under this Lease within 20 days after its due date; (b) you default on or breach any of the other terms and conditions of this Lease and fail to cure such breach within 20 days after written notice of such default or breach from us; (c) any representation or warranty made by you in this Lease, all other material agreements by and between you and us, and any application for credit, financial statement or financial data required to be provided by you in connection with this Lease proves to be incorrect in any material respect when made or reaffirmed; (d) circumstances arise where you become or are likely to become subject to any form of insolvency or other administration, whether voluntary or involuntary (and, if such proceeding is involuntary, it is not dismissed within 60 days after the date such proceeding is filed), or fail generally to pay your respective debts as they become due; (e) you stop doing business as a going concern or make an assignment for the benefit of creditors, appoint a trustee or receiver or undergo a substantial deterioration of financial health; (f) you merge, consolidate, or transfer all or substantially all of your assets or stock without our prior written consent which consent shall not be unreasonably withheld or delayed; (g) any letter of credit or guaranty issued in support of a Lease is revoked, breached, cancelled or terminated (unless consented to in advance by us); (h) any Guarantor fails to fulfill its obligations in favor of us pursuant to its guaranty; or (i) any Equipment is levied against, seized or attached. If any Default occurs, we may, in our sole discretion, exercise one or more of the following remedies: (1) declare without notice all Lease payments and other amounts due and to become due under this Lease to be immediately due and payable, (2) immediately take possession of, or render unusable, the Equipment wherever located, without demand or notice and without any court order or other process of law, and no such action will constitute a termination of any Lease, (3) terminate this Lease; (4) require you to deliver the Equipment to a location specified by us; (5) collect all costs of collection, including reasonable attorneys' fees, (6) collect lost tax benefits and all unpaid amounts due hereunder, (7) proceed by court action to

Rev 06/2002

enforce performance by you of this Lease and/or to recover all damages and expenses incurred by us by reason of any Lessee Default; and (8) exercise all other remedies at law or equity. You agree to pay us interest on any Lease payment or other amount due hereunder that is not paid within 10 days of its due date, at the rate of 1-1/2% per month (or such lesser rate as is the maximum rate allowable under applicable law). Your payments may be applied, as we elect, first to the oldest amount due. Upon repossession or surrender of any Equipment, we may lease, sell or otherwise dispose of the Equipment in a commercially reasonable manner, with or without notice and at public or private sale, and apply the net proceeds thereof to the amounts owed to us under this Lease; provided, however, that you will remain liable to us for any deficiency that remains after any sale or lease of such Equipment. Any proceeds of any sale or lease of such Equipment in excess of the amounts owed to us under this Lease will be retained by us. You agree that with respect to any notice of a sale required by law to be given, 10 days notice will constitute reasonable notice. These remedies are cumulative of every other right or remedy given under this Lease or now or after the date of this Lease existing at law or in equity or by statute or otherwise, and may be enforced concurrently with such other rights or remedies or from time to time. Our action or failure to act on any one remedy shall not constitute an election of such as our sole remedy. Any provision of this Lease is severable if unenforceable.

You agree to sign such other documents and take such other actions as we may reasonably require to accomplish the intent and purpose of this Lease. All of your representations, warranties and obligations hereunder shall survive the termination of this Lease. All notices, demands and other communications required to be given under this Lease shall be in writing and shall be deemed to have been given if delivered personally or mailed via certified mail or a nationally recognized overnight courier service. TIME IS OF THE ESSENCE. THIS LEASE SHALL BE DEEMED FULLY EXECUTED AND PERFORMED IN THE STATE OF NEW JERSEY AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS THEREOF. THE PARTIES HERETO EXPRESSLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY JURISDICTION. YOU WAIVE ANY STATUTORY PROVISIONS WHICH CONFLICT WITH THE TERMS OF THIS LEASE, INCLUDING BUT NOT LIMITED TO UCC ARTICLE 2A SECTION 303 AND SECTIONS 508 THROUGH 522. You acknowledge that neither any Vendor nor any Equipment salesperson is an agent of ours nor are they authorized to waive or alter the terms of this Lease. Their representations in no way affect any of our rights and obligations as herein set forth. You agree that an executed copy of this Lease bearing our original manual signature and your signature (either an original manual signature or such signature reproduced by means of a reliable electronic form, such as a photocopy or facsimile), shall be marked "Original" by us and shall constitute the only original document for all effective purposes; all other copies shall be duplicates. To the extent this Lease constitutes chattel paper (as defined in the UCC), no security interest in this Lease may be created except by possession or transfer of the executed copy marked "Original" by us.

By signing below you hereby represent, warrant and covenant that, with respect to this Lease: (i) the execution, delivery and performance of all of your covenants and obligations hereunder have been duly authorized by all necessary corporate action, and (ii) the officer executing such was duly authorized to do so. THIS LEASE IS NON-CANCELLABLE AND IS OUR FULL AND FINAL AGREEMENT, MERGING ALL PRIOR UNDERSTANDINGS, AND CANNOT BE MODIFIED EXCEPT BY A WRITTEN AGREEMENT SIGNED BY YOU AND BY US. YOU WARRANT TO US THAT YOU HAVE RECEIVED, REVIEWED AND APPROVED YOUR VENDOR'S WRITTEN SUPPLY CONTRACT COVERING THE EQUIPMENT TERMS OF SALE AND WARRANTIES. YOU HEREBY AUTHORIZE US TO PURCHASE THE EQUIPMENT IN RELIANCE SOLELY UPON YOUR STATEMENTS HEREIN. YOU AGREE TO EXECUTE AND DELIVER TO US A DELIVERY AND ACCEPTANCE CERTIFICATE EVIDENCING YOUR UNCONDITIONAL AND IRREVOCABLE ACCEPTANCE OF THE EQUIPMENT. "ACCEPTANCE DATE" MEANS SUCH DATE SET FORTH IN ANY DELIVERY AND ACCEPTANCE CERTIFICATE. By signing a copy of this Lease where required below, you are agreeing to all of the terms and conditions of this Lease, including the terms and conditions contained in Schedule A which is hereby incorporated by reference into this Lease. This Lease shall become effective upon our acceptance hereof but we will have no obligation to purchase the Equipment until you have accepted it as set forth below.

LESSEE: ADVANCED CARD SYSTEMS, INC. D/B/A SANDIA IMAGING

BY:

Print Name: BERTRAND L. PELLETIER

Print Title of Authorized Signatory:
PRESIDENT & CEO

LESSOR: HEWLETT-PACKARD FINANCIAL SERVICES COMPANY

BY:

Print Name:

Print Title of Authorized Signatory:

# EXHIBIT D



**ADVANCED CARD SYSTEMS INC.**
2001 E. Randoll Mill Road Bldg #109  ARLINGTON, Texas 76011 USA
Toll-free 800/609-8188 or 817/649-3222 Fax 817/649-3301
E-mail www.corporate@sandiaimaging.com web site www.sandiaimaging.com

Arlington, August 25, 2003

INDIGO AMERICA INC.
DIGITAL PUBLISHING SOLUTIONS
Mr. Vince Pentella – National Sales Mgr
400 Unicorn Park Dr.
WOBURN, MA  01801

HP s2000 SER. 11200815 – CUST 11043

Dear Vince:

We are at then end of the month of August, and we are still waiting for the adaptation of our equipment to the printing of 28 mil thick plastic sheets.
As you certainly recall, during the early stages of the decision to purchase this equipment, the condition for the purchase was the ability to produce the standard CR80-30 ISO plastic card which represents the largest part of SANDIA IMAGING's business (over 4 million $ in revenue in 2002).
Yourself and your sales team represented that our business of producing high-quality, quick turnaround plastic card printing jobs would be enhanced both in quality, volume and speed using the s2000 as an addition to our current traditional plastic printing litho presses, and that the initial sheet thickness limitations of the s2000 would be promptly modified to allow for up to 28 mil thick sheets digital printing. In anticipation in January 2003, we moved to a larger location, purchased the ancillary equipment necessary to produce a finished product, hired and sent a specific crew to the HP training, invested in plastic sheets coating tests and supplies, the total outlay is at this point over $300,000.00.
Due to the recurring delay in modifying the s2000 promised at purchase in December 2002, we had to re-engineer over the past 2 months our production process to adapt to split core which in turn impacts negatively our production costs and cause additional delays in production, the major delay being the coated plastic sheet suppliers production cycle in excess of 6-8 weeks plus shipping.
The billable production generated by your equipment in August has been less than $11,000.00 to date; we hope to be able to reach $25,000.00 by Month's end, but with a sizeable shortfall in gross margin.

This situation has severely impacted the profitability of this company and brought severe cash-flow problems since the month of June 2003, which will necessitate more time to correct as we keep this situation going.
I would appreciate if immediate attention and corrective action can be brought to this situation.
Sincerely,

Bertrand L. Pelletier
President & COO


Cc: P. Orsetti – Chairman – Advanced Card Systems Inc.

ADVANCED PRINTING & PRINTING EQUIPMENT FOR THE PLASTIC CARD INDUSTRY

# EXHIBIT E

# Certificate of Completion

## Joel Maldonado

is hereby recognized as having successfully completed the Indigo America
Shared Support Training Course on September 1, 2000

**indigo**

Ned Stubblefield
Technical Training Specialist
Indigo America

Dave Rogers
National Training Manager
Indigo America

Boris Bel
Director of Customer Support
Indigo America

Benny Landa
Chairman & Founder
Indigo

INDIGO TRAINING PROGRAMS